1   F. Thomas Edwards, Esq. (NV Bar No. 9549)
    Email: tedwards@nevadafirm.com
2   Mary Langsner, Ph.D. (NV Bar No. 13707)
    Email: mlangsner@nevadafirm.com
3   HOLLEY DRIGGS
    400 South Fourth Street, Third Floor
4   Las Vegas, Nevada 89101
    Telephone: 702/791-0308
5   Facsimile: 702/791-1912

6   *Attorneys for Charles J. LaDuca; Buggy Holdings LLC; Juan Cespedes; John L. Eickholt;*
    *Jaisen Freeman; Freeman Master Holdings, LLC; Jennifer North aka Jennifer Floyd; John*
7   *Andrew Phillips; Gay Su Pinnell; Sonia Dassow Ribeiro aka Sonia Dassow aka Sonia Ribeiro;*
    *Robert Schuerger; Thomas Weihe, by and through his representative Gwen Weihe;*
8   *Jeffrey Wright*

9                    **UNITED STATES BANKRUPTCY COURT**

10                          **DISTRICT OF NEVADA**

11  | In re: | Case No. 21-14688-ABL |
    | MATTHEW JAMES TURNIPSEEDE and | Chapter 7 |
12  | SONYA JAGDISH SHAH TURNIPSEEDE, | |
    | | |
13  | Debtors. | |
    | | |
14  | CHARLES J. LADUCA; BUGGY HOLDINGS | |
    | LLC; JUAN CESPEDES; JOHN L. EICKHOLT; | Adv. No. |
15  | JAISEN FREEMAN; FREEMAN MASTER | |
    | HOLDINGS, LLC; JENNIFER NORTH aka | **COMPLAINT FOR DETERMINATION** |
16  | JENNIFER FLOYD; JOHN ANDREW | **OF DISCHARGEABILITY OF DEBT** |
    | PHILLIPS; GAY SU PINNELL; SONIA | **PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A),** |
17  | DASSOW RIBEIRO aka SONIA DASSOW aka | **(a)(2)(B), AND (a)(4), AND FOR CIVIL** |
    | SONIA RIBEIRO; ROBERT SCHUERGER; | **CONSPIRACY** |
18  | THOMAS WEIHE, BY AND THROUGH HIS | |
    | REPRESENTATIVE GWEN WEIHE; | |
19  | JEFFREY WRIGHT, | Judge: Hon. August B. Landis |
    | | |
20  | Plaintiffs, | |
    | | |
21  | v. | |
    | | |
22  | MATTHEW JAMES TURNIPSEEDE and | |
    | SONYA JAGDISH SHAH TURNIPSEEDE, | |
23  | | |
    | Defendants. | |
24

25                          **COMPLAINT**

26       Charles J. LaDuca; Buggy Holdings LLC; Juan Cespedes; John L. Eickholt; Jaisen

27  Freeman; Freeman Master Holdings, LLC; Jennifer North aka Jennifer Floyd; John Andrew

28  Phillips; Gay Su Pinnell; Sonia Dassow Ribeiro aka Sonia Dassow aka Sonia Ribeiro; Robert

14749-01/2668176_7.docx

Schuerger; Thomas Weihe, by and through his representative Gwen Weihe; and Jeffrey Wright (collectively, "Plaintiffs"), by and through undersigned counsel F. Thomas Edwards, Esq. and Mary Langsner, Ph.D. of the law firm Holley Driggs, hereby file their Complaint for Determination of Dischargeability of Debt Pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), and (a)(4), and for Civil Conspiracy ("Complaint").  This Complaint asks the Court to find that all indebtedness owed to the Plaintiffs by debtor Matthew James Turnipseede ("Matt"[1]) and by debtor Sonya Jagdish Shah Turnipseede ("Sonya") (Sonya collectively with Matt, the "Debtors" also referenced collectively herein as the "Defendants") be excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), and (a)(4) for the Debtors together and/or separately having incurred debt owed to the Plaintiffs for money, property, services, and for extensions or renewals of credit obtained by false pretenses, false representations, and actual fraud; for the Debtors together and/or separately having incurred debt owed to the Creditors for money, property, services, and for extensions or renewals of credit obtained by the use of a statement in writing that is materially false, respecting the Debtors' or any insider of the Debtors' financial condition, on which statements the Plaintiffs reasonably relied, that the Debtors together or separately caused to be made or published with intent to deceive; and for the Debtors together and/or separately having committed fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. This Complaint is brought pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), and (a)(4), and FED. R. BANKR. P. 7001(6) and alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the adversary proceeding commenced by the filing of this Complaint pursuant to 28 U.S.C. §§ 1334 and 157, and Local Rule of Bankruptcy Practice of the United States District Court for the District of Nevada ("LR") 1001(b)(1).  The adversary proceeding commenced by the filing of this Complaint is a core proceeding under 28 U.S.C.

---

[1] Debtors, a married couple, share the same last name. For ease of reference herein, Mr. Turnipseede is referred to as "Matt" and Mrs. Turnipseede is referred to as "Sonya".  No disrespect is intended through the use of the Debtors' first names.

14749-01/2668176_7.docx

§§ 157(b)(2)(A), (I), and (O).  Venue is appropriate in the District of Nevada pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      This adversary proceeding is commenced in connection with the chapter 7 bankruptcy case of debtors Matthew James Turnipseede and Sonya Jagdish Shah Turnipseede pending in the United States Bankruptcy Court for the District of Nevada as Case No. 21-14688-ABL (the "Bankruptcy").

3.      In accord with LR 7008, Plaintiffs consent to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

**PARTIES**

4.      Plaintiff Charles J. LaDuca ("LaDuca") is an individual residing in Bethesda, Maryland.

5.      Plaintiff Buggy Holdings LLC ("Buggy Holdings") is a limited liability company organized in Ohio.

6.      Plaintiff Juan Cespedes ("Cespedes") is an individual residing in Columbus, Ohio.

7.      Plaintiff John L. Eickholt ("Eickholt") is an individual residing in Dublin, Ohio.

8.      Plaintiff Jaisen Freeman ("Mr. Freeman") is an individual residing in Chicago, Illinois and is the principal of Freeman Holdings (defined below).

9.      Plaintiff Freeman Master Holdings LLC ("Freeman Holdings"; collectively with Mr. Freeman, "Freeman") is a limited liability company in Miami Beach, Florida.

10.     Plaintiff Jennifer North a/k/a Jennifer Floyd ("North") is an individual residing in Plain City, Ohio.

11.     Plaintiff John Andrew Phillips ("Phillips") is an individual residing in Palm Springs, California.

12.     Plaintiff Gay Su Pinnell ("Pinnell") is an individual residing in Dublin, Ohio.

13.     Plaintiff Sonia Dassow Ribeiro a/k/a Sonia Dassow a/k/a Sonia Ribeiro ("Ribeiro") is an individual residing in Burleson, Texas.

- 3 -

14. Plaintiff Robert Schuerger ("Mr. Schuerger") is an individual residing in Upper Arlington, Ohio.

15. Mr. Schuerger is the principal of Buggy Holdings (Buggy Holdings collectively with Mr. Schuerger, "Schuerger").

16. Plaintiff Tom Weihe ("Mr. Weihe") is a deceased individual and is represented by and through his representative Gwen Weihe ("Mrs. Weihe"; together with Mr. Weihe, "Weihe") who resides in Dublin, Ohio.

17. Plaintiff Jeffrey Wright ("Wright") is an individual residing in Phoenix, Arizona.

18. Defendant Matthew James Turnipseede is an individual residing in Clark County, Nevada.

19. Defendant Sonya Jagdish Shah Turnipseede is an individual residing in Clark County, Nevada.

20. Matt and Sonya are married to one another.

21. Moneyline Analytics, LLC ("Moneyline") is a now-revoked limited liability company organized under the laws of Nevada.

22. Matt is, and at all relevant times herein was, the managing member of Moneyline.

23. Upon information and belief, through at least October 2020, Sonya was an officer of Moneyline.

24. Upon information and belief, at all relevant times herein, Sonya was a principal of Moneyline.

25. Fusion Capital LLC ("Fusion") is a limited liability company organized under the laws of Nevada.

26. Upon information and belief, Matt is a principal of Fusion.

27. Upon information and belief, Moneyline held a twenty-five percent interest in Fusion.

28. Upon information and belief, Advantage Analytics, LLC ("Advantage") held a twenty-five percent interest in Fusion.

- 4 -

29.    MLA DUB LLC ("Dublin") is a now-revoked limited liability company organized under the laws of Nevada.

30.    Matt is, and at all relevant times herein was, the managing member of Dublin.

31.    Upon information and belief, Dublin was also known as MLA Dublin; upon information and belief, Dublin was also known as Moneyline Dublin.

32.    Edgewize LLC ("Edgewize") is a now-permanently revoked limited liability company organized under the laws of Nevada.

33.    Upon information and belief, Matt was the principal of Edgewize.

34.    Upon information and belief, Edgewize is also known as "Edgewise".

35.    In or about 2016, upon information and belief, Edgewize re-branded as Moneyline.

36.    Edge Sports Analytics LLC ("Edge Sports") is a limited liability company organized under the laws of Nevada.

37.    Matt is, and at all relevant times herein was, the managing member of Edge Sports.

38.    Moneyline, Fusion, Advantage, Dublin, Edgewize, and Edge Sports are identified collectively herein as the "Known Affiliates".

39.    Matt is an insider of and/or a principal in all of the Known Affiliates.

40.    Upon information and belief, Sonya is an insider in all of the Known Affiliates.

41.    On at least two occasions during the time span of approximately 2015 – 2020, in correspondence issued to, *inter alia*, multiple Plaintiffs, Matt self-identified as a "steward of your investment funds" and "as the steward of your money . . . ."

## GENERAL ALLEGATIONS

42.    On or about May 13, 2021 ("Moneyline Petition Date"), Matt caused Moneyline to file a voluntary chapter 7 petition under the Bankruptcy Code,[2] commencing the *In re Moneyline Analytics, LLC* bankruptcy case, Bankr. D. Nev. Case No. 21-12443-NMC ("Moneyline Case").

43.    On or about September 27, 2021 ("Turnipseede Petition Date"), Matt and Sonya filed a joint voluntary chapter 7 petition under the Bankruptcy Code, commencing the *In re*

---

[2] 11 U.S.C. §§ 101 – 1532 ("Bankruptcy Code").

- 5 -

*Matthew James Turnipseede and Sonya Jagdish Shah Turnipseede* bankruptcy case, Bankr. D. Nev. Case No. 21-14688-ABL ("Turnipseede Case").

**LADUCA**

44.    LaDuca was introduced to Matt in the summer of 2020, through Matt's cousin Geoff Verhoff ("Verhoff"), when Verhoff hosted a round of gold at the Army Navy Club.

45.    After hearing how well Verhoff was doing with his investment with Matt's fund Moneyline, and hearing from Matt how well things were going with this business, Verhoff, Tony Pierce ("Pierce"), Michael Rossetti ("Rosetti"),[3] and LaDuca agreed to go to Las Vegas on November 18, 2020, to golf, meet some of Matt's investors and employees, and discuss an investment.

46.    On that trip, Pierce, Verhoff, Rossetti, and LaDuca spent three days golfing and meeting an employee of Matt and a large investor of Matt.

47.    On or about November 22, 2020, Matt opened an account with the pledge from LaDuca of approximately $50,000.00 and Pierce of approximately $25,000.00 ("LaDuca MLA Account").[4]

48.    Beginning on or about November 25, 2020, and lasting about one month, LaDuca received from Matt information showing investment was returning at least thirty-five percent (35%).

49.    However, shortly thereafter Matt went radio silent for about five weeks, despite LaDuca and Pierce reaching out to him.

50.    On or about December 27, 2020, Matt sent an email, with a spreadsheet attachment to LaDuca and Pierce, stating, "After 35 days we are on a pace to return just over 49%."

51.    On or about January 18, 2021, Matt sent an email to LaDuca and Pierce with a spreadsheet of alleged activity from November 25, 2020, through January 17, 2021; Matt indicated the spreadsheet showed investment was "trending at just over 35% return pace."

---

[3] Verhoff, Pierce, and Rossetti are not parties to this Complaint.

[4] Subsequently, on or about December 7, 2020, Matt expressly confirmed to LaDuca that LaDuca's approximately $50,000.00 had been received.

52.    On or about January 28, 2021, Matt flew to Washington, D.C., to meet with LaDuca, Pierce, and Verhoff, and the group lunched at The Palm. Matt told LaDuca, Pierce, and Verhoff he needed them to invest another approximately $250,000.00, and they could either invest the money themselves or find other people to do so.  In the course of this conversation, Matt indicated his business was going so well that he did not have the "bandwidth" to manage their smaller accounts, but they would receive his personal attention if they made the additional investment. Matt confirmed the meeting and responded to some questions in an email dated later that day ("1/28/2021 Email").

53.    In the 1/28/2021 Email, Matt referred to his "white glove accounts up and over approximately $250k," for which "personalized reporting can continue."

54.    In the 1/28/2021 Email, Matt attempted to induce further investment by stating, "I have created wagers – tickets with certain built-in protection devices that assist us in winning when the favored team wins, and greatly mitigates our losses when they don't.  I'd like to exploit this weakness in the wager field to full capacity, and open up several more of these such threads. Being fully backed allows me to do this on a greater scale, and in turn, the return rises."

55.    LaDuca, Pierce, and Verhoff did not invest further.  Specifically, LaDuca told Matt at the January 28, 2021, lunch that LaDuca would not be investing further, and LaDuca declined Matt's request to encourage others to invest.

56.    For the next approximately three (3) months LaDuca and Pierce emailed and called Matt asking for documents for their respective tax returns and for information related to the funds invested. For example, on or about March 22, 2021, LaDuca inquired to Matt, "How's our account doing?"  But Matt did not provide a status on the account.

57.    By way of further example, on or about April 18, 2021, LaDuca wrote, "Hi Matt, . . . Can we please see an updated recent result of our investment?"  However, Matt did not respond to the query but instead diverted focus, stating, "I am solely focussed [sic] on trying to get everyone's K-1 forms out . . . ."  LaDuca even followed up on this email chain emphasizing, "Would also love to see 2021 results" but Matt did not respond.  Less than one week later, LaDuca again asked, "And where are we with gains/losses in 2021, Please?" but Matt did not respond.

- 7 -

58.     Throughout the course of these months, Matt either did not respond to queries or, if he did respond, provided vague answers, such as, "My accountant and I are finalizing soon." (in an April 28, 2021 email).

59.     On or about May 10, 2021, after many months of Matt's silence, LaDuca and Pierce decided it was time to redeem their respective investments and sent Matt a redemption email.

60.     On or about May 11, 2021, Matt called LaDuca. He told LaDuca that his lawyer had instructed him not to speak with LaDuca, but that since LaDuca was a close friend of his cousin Verhoff, and he liked LaDuca and felt bad, that he wanted to let LaDuca know personally the "monies are gone" and that he will be filing bankruptcy, and he was sure LaDuca could get some monies back from the bankruptcy.  During this conversation, Matt further stated he felt horrible having asked LaDuca and Pierce for the additional approximately $250,000.00 in or about January 2021, but Matt had planned to use that money to pay back other people who were redeeming their investments.  During the conversation, Matt also referenced a legal issue with "Dublin and a run on his accounts due to redemptions, so he needed our money to clear that up."

61.     On May 13, 2021, Moneyline filed bankruptcy, showing, among other things, LaDuca as a creditor for the amount of approximately $50,000.00.

62.     On or about May 15, 2021, prior to LaDuca's being informed of the Moneyline Bankruptcy, Matt emailed LaDuca and Pierce that his accountants will be sending year end statements shortly.  However, LaDuca has never received a K-1.

63.     LaDuca responded to Matt with a request for clarification regarding the bankruptcy and the confusion regarding Matt's multiple companies, and referenced Matt's prior representations that LaDuca's personal investment was kept in a separate account and not commingled, but Matt did not respond or advise where LaDuca's approximately $50,000.00 investment was or why he had commingled it.

64.     LaDuca did not receive a response.

65.     On September 27, 2021, the Turnipseede Bankruptcy was filed, showing, among other things, LaDuca as a creditor for the amount of approximately $50,000.00.

- 8 -

HOLLEY DRIGGS

66.    LaDuca invested a total of approximately $50,000.00 and, to date, has not received any monies back.

67.    LaDuca relied on documentation received from Matt and/or Moneyline, and/or upon information and belief Sonya, to prepare and pay taxes.

68.    Matt used his relationship to and affiliation with the Known Affiliates in furtherance of his scheme to defraud LaDuca.

69.    Matt used his relationship to and affiliation with Sonya in furtherance of his scheme to defraud LaDuca.

70.    Sonya used her relationship to and affiliation with the Known Affiliates in furtherance of her scheme to defraud LaDuca.

71.    Sonya used her relationship to and affiliation with Matt in furtherance of her scheme to defraud LaDuca.

72.    Upon information and belief, all of LaDuca's invested funds have been embezzled, spent, and/or otherwise disposed of by the Debtors, and LaDuca lost funds as a result of the Debtors' fraudulent scheme.

73.    Upon information and belief, all or nearly all of the funds invested by LaDuca were gone, and did not exist in the amounts stated at the time such statements, financial statements, and reports were received by LaDuca from Matt and/or Sonya and/or Moneyline.

74.    Upon information and belief, all of the statements, financial statements, reports, and K-1s received by LaDuca were generated by Matt and/or Sonya and/or Moneyline and portrayed false information concerning LaDuca investment funds.

75.    As a result of *inter alia*, the foregoing, plus any taxes and/or liabilities and/or penalties thereupon, the Debtors incurred a debt owed to LaDuca (the "LaDuca Debt").

**CESPEDES**

76.    Cespedes was introduced to Matt through a mutual acquaintance.

77.    On or about March 8, 2015, Cespedes invested with Matt approximately $5,000.00, at a time when Matt's company was then-called Edgewize.  Cespedes was later informed that in 2016 Edgewize re-branded into Moneyline. Cespedes continued to make investments into

- 9 -

Moneyline over a period of years based on multiple representations by Matt including representations that Cespedes' investments were each managed as separate threads.

78.     Matt always explained to Cespedes that Matt listed the investments as separate for accounting purposes and consistently described investment periods as "threads."  Matt stated to Cespedes that the yearly goal for investments would be to secure a 20% minimum return, which Matt described to Cespedes as achieved through micro-betting.

79.     As described to Cespedes, micro-betting meant Matt and/or Sonya and/or Moneyline would make a large volume of small bets to keep the overall portfolio risk down—in connection with which Matt said that he would look at a pool of money and find the daily rate of return necessary to achieve 20% over the course of a year, and would target securing that small return daily.

80.     Furthermore, Matt's representations to Cespedes led Cespedes to believe that Cespedes' investments made money each year.  As part of this, Matt routinely told Cespedes that a standard yearly return was 20%, and the year-end written statements Moneyline provided to Cespedes corroborated these representations.  For example, Matt conveyed being disappointed and apologetic if a particular year produced anything less than twenty percent.

81.     Ultimately, Cespedes paid taxes on the gains Moneyline told Cespedes were being made on Cespedes' investments.

82.     A 2015 statement for Cespedes was issued by Edgewize showing an investment of approximately $5,000.00 with a 19.98% return rate of approximately $142.45 for an investment value of approximately $5,142.45 as of August 9, 2015.

83.     In or about May 2016, Cespedes invested additional funds of approximately $45,000.00 ("May 2016 Investment").

84.     On or about January 11, 2017, Cespedes invested additional funds of approximately $35,000.00 ("Jan. 2017 Investment").

85.     On or about September 5, 2017, Cespedes invested additional funds of approximately $10,000.00 ("Sept. 2017 Investment").

86.    On or about December 15, 2017, Cespedes invested additional funds of approximately $20,000.00 ("Dec. 2017 Investment").

87.    On or about January 11, 2018, Cespedes invested additional funds of approximately $20,000.00 ("Jan. 2018 Investment").

88.    The 2016 – 2018 statement for Cespedes was issued by Moneyline showing an increased starting investment on October 16, 2016, of approximately $109,831.00, with earnings of approximately $46,722.00; and, later, as of December 31, 2018, an investment value of approximately $156,553.00—also referencing the Jan. 2017 Investment showing as earning approximately $24,019.00, for a total of approximately $59,019.00; the Sept. 2017 Investment showing as earning approximately $2,483.00 for a total of approximately $12,483.00; the Dec. 2017 Investment showing as earning approximately $3,924.00 for a total of approximately $23,924.00; and the Jan. 2018 Investment showing as earning approximately $4,027.00 for a total of approximately $24,027.00.

89.    Cespedes received a K-1 from Moneyline for 2018 ("Cespedes 2018 Moneyline K-1") which noted the Jan. 2018 Investment and stated Cespedes had earnings for 2018 incorporated into a total investment value.

90.    Cespedes received a 2019 statement by Moneyline showing "Approx. Earnings" for Cespedes' multiple accounts, noting four- and five-figure increases in value across these accounts.

91.    Cespedes also received a K-1 from Moneyline for 2019 ("Cespedes 2019 Moneyline K-1") again showing a four-figure increase in investments.

92.    Cespedes also received a 2020 statement from Moneyline showing "Projected" earnings of four- and five-figure increases across all of Cespedes' investments.

93.    Over the years and course of Cespedes' investments with Moneyline and/or Edgewize and/or Matt and/or Sonya, Cespedes met with Matt and Sonya on several occasions. During these meetings Sonya expressly represented that the fund was successful and making money year after year.

94.     Over the course of time, Matt repeatedly pressed Cespedes to facilitate introductions to other investors for Matt's benefit.  Never once in the course of Cespedes' meetings with Matt and Sonya was Cespedes ever told that Moneyline or Matt's and Sonya's funds were losing money in any capacity.  On the contrary: Matt and Sonya painted a rosy picture to persons interested in investing.

95.     However, when Cespedes requested better consistency in the representations of Matt's hiring practices and workforce, and pressed Matt to add technology so investors such as Cespedes could view their accounts electronically in real time, Matt would not follow through.

96.     Furthermore, when Cespedes repeatedly asked for clarity regarding Sonya's role in Moneyline and other companies, Matt at times described Sonya as placing bets, being in charge of her own portion of the business, as a finance manager, or as a specialist in financial services.

97.     Matt also pressed Cespedes to invest in Matt's Moneyline affiliate MLA Dublin, which Matt described as involving a brick-and-mortar betting business in Dublin, Ohio.  Cespedes emphatically conveyed he was not interested in further investing with Moneyline through this new MLA Dublin project.

98.     In the course of dialogue surrounding MLA Dublin, Cespedes nearly withdrew his investments in Moneyline but then decided against that based on Matt's express representation and reassurance that the MLA Dublin project of Monelyine would have no impact on Cespedes' investments or the standard investment returns Cespedes and others were receiving.

99.     Matt represented to Cespedes that there were two separate pools of money and that Moneyline investments like Cespedes' were considered the conservative fund (at twenty percent); meanwhile, Moneyline's MLA Dublin project was more aggressive and was led by Matt and Clayton Graham ("Graham").

100.    Later, toward the end of 2020, Cespedes needed to make a five-figure withdrawal on his investments, at a point when Moneyline's statements reflected a value for his investments of approximately $250,000.00.  Despite having discussed the withdrawal in advance with Matt, and Cespedes' taking the five-figure withdrawal, on or about December 28, 2020, Matt solicited Cespedes for an additional approximately $60,000.00.  Cespedes refused.

- 12 -

14749-01/2668176_7.docx

101.    Next, on or about January 28, 2021, Cespedes received a text message from Matt that there were "big liquidations" and more money was "needed."  However, Matt followed this with additional communications that he wanted to keep the fund on a nice par but wanted "coffers stuffed"—quelling the alarm caused by Matt's demand.

102.    On or about March 17, 2021, for the first time, Matt conveyed to Cespedes that Moneyline "is not in good shape at all due to the pandemic withdrawals[]" and began to present a convoluted storyline about intermingled businesses and Moneyline's MLA Dublin project.  At this point Matt directly solicited Cespedes to help Matt find money to rectify a legal issue with investors allegedly related to Moneyline's MLA Dublin project.  Prior to this point, Cespedes had been told by Matt that there was no commingling of funds between Moneyline and the MLA Dublin project.

103.    In addition, Cespedes made several efforts communicating with Matt to obtain K-1 statements for Cespedes' investments in Moneyline for 2020.  During these communications, Matt repeatedly assured Cespedes that K-1s were on the way and would reflect documented earnings.

104.    In connection with Moneyline's bankruptcy, Matt represented to Cespedes that Cespedes could expect to receive his investment principle as a byproduct of the Moneyline bankruptcy—advice Matt attributed to his counsel.

105.    Cespedes relied on documentation received from Matt and/or Moneyline and/or Edgewize and/or Sonya to prepare and pay taxes.

106.    Matt used his relationship to and affiliation with the Known Affiliates in furtherance of his scheme to defraud Cespedes.

107.    Matt used his relationship to and affiliation with Sonya in furtherance of his scheme to defraud Cespedes.

108.    Sonya used her relationship to and affiliation with the Known Affiliates in furtherance of her scheme to defraud Cespedes.

109.    Sonya used her relationship to and affiliation with Matt in furtherance of her scheme to defraud Cespedes.

- 13 -

110. Upon information and belief, all of Cespedes invested funds have been embezzled, spent, and/or otherwise disposed of by the Debtors, and Cespedes lost funds as a result of the Debtors' fraudulent scheme.

111. Upon information and belief, all or nearly all of the funds invested by Cespedes were gone, and did not exist in the amounts stated at the time such statements, financial statements, reports, and K-1s were received by Cespedes from Matt and/or Sonya and/or Moneyline and/or Edgewize.

112. Upon information and belief, all of the statements, financial statements, reports, and K-1s received by Cespedes were generated by Matt and/or Sonya and/or Moneyline and/or Edgewize and portrayed false information concerning Cespedes investment funds

113. As a result of, *inter alia*, the foregoing, plus any taxes and/or liabilities and/or penalties thereupon, the Debtors incurred a debt owed to Cespedes (the "Cespedes Debt").

**EICKHOLT**

114. In or about 2012, Eickholt was introduced to Matt through a mutual acquaintance at a meeting held at a local country club in Ohio.

115. On or about August 31, 2013, Eickholt initially invested approximately $12,500.00 with Matt and/or Edgewize.

116. Due to growth of Eickholt's initial investment, Eickholt invested more money over time with Matt and/or Sonya and/or Monelyine, and at times these investments were also referenced as investing in "the fund".

117. For example, Eickholt invested approximately $1,708.15 on or about February 10, 2014, in connection with Edgewize.

118. Edgewize issued a K-1 to Eickholt for 2014 (the "Eickholt 2014 Edgewize K-1") showing earnings on Eickholt's investment.

119. Edgewize issued a statement to Eickholt for period ending February 1, 2015, showing that approximately $15,000.00 invested earned approximately $1,075.38 in earnings for a total investment value of approximately $16,075.38, a 21.22% "Current Annual Return Rate" for a "Deal Period" of 126 days.

- 14 -

14749-01/2668176_7.docx

120. Next, Eickholt invested another approximately $8,537.48 on or about February 9, 2015, in connection with Edgewize.

121. Edgewize issued multiple statements to Eickholt as of August 9, 2015, with one noting that approximately $25,000.00 invested to date had earned approximately $1,630.00 for a total investment value of approximately $26,630.00, reflecting a 19.99% rate of return for a "Deal Period" covering 119 days; meanwhile, another eighty (80) days in a "Deal Period" had resulted in a 19.98% "Current Annual Return Rate" and increased investment value of $1,095.80.

122. Edgewize issued a K-1 to Eickholt for 2015 (the "Eickholt 2015 Edgewize K-1") showing earnings on Eickholt's investment.

123. On or about January 24, 2016, Eickholt invested approximately $15,000.00 with Moneyline.

124. In or about the spring of 2016, Moneyline issued a statement to Eickholt noting an investment value as of March 10, 2016, of approximately $30,538.05, plus an additional $304.10 earned on the approximately $15,000.00 invested in January 2016, with both investments showing a 19.99% "Current Annual Return Rate" and noting the number of days in the "Deal Period" for each respective investment.

125. Moneyline then issued a statement to Eickholt for 2016 showing an investments value as of December 31, 2016, of approximately $35,228.00 plus an additional approximately $2,696.00 of earnings on the approximately $15,000.00 invested in January 2016, with both investments showing a 19.96% "Current Annual Return Rate" and noting the number of days in the "Deal Period" for each respective investment.

126. Upon information and belief, throughout 2015 and 2016, Eickholt consistently received correspondence and/or statements from Sonya.

127. In or about mid-2017, Moneyline issued a statement to Eickholt showing investments value as of July 15, 2017, of approximately $58,492.00, representing a "Rate of return recap" of 192 days in the "Deal Period" with a "Current Annual Return Rate" of 19.58%.

128. Moneyline issued a K-1 to Eickholt for 2017 (the "Eickholt 2017 Moneyline K-1") showing earnings on Eickholt's investment.

- 15 -

129. Moneyline also issued a statement to Eickholt for 2017 showing total investment value as of December 31, 2017, of approximately $60,862.00.

130. In or about mid-2018 Moneyline issued a statement to Eickholt showing an investments value for Eickholt as of July 15, 2018, of approximately $67,353.00.

131. Moneyline issued a K-1 to Eickholt for 2018 (the "Eickholt 2018 Moneyline K-1") showing earnings on Eickholt's investment.

132. Moneyline also issued a statement to Eickholt for 2018 showing total investment value as of December 31, 2018, of approximately $72,462.00. On this statement is a note from Matt saying, "Thank you for your patience as we move to online reporting…I am posting your report there too, but wanted to send this quick for your to have."

133. Amidst Matt's continual written representations respecting increases in Eickholt's investments with Moneyline, in or about December 2018-January 2019 Matt invited Eickholt and others to a meeting at the Country Club at Muirfield Village. At this meeting, Matt made a presentation and encouraged formation of a Moneyline affiliate involving what Eickholt understood as the Moneyline Dublin project (the "Moneyline Dublin Pitch Meeting").

134. At the Moneyline Dublin Pitch Meeting, Matt induced additional investment by stating that the Moneyline Dublin investors would have a more profitable position in the business because they were founders. Matt also referenced Clay Graham as the "Professor." Matt said to Eickholt and the others that if he could raise approximately $2 million then there would be great business. After this meeting, Eickholt increased his investment by approximately $75,000.00. Matt asserted that he and his family were part of the local community and could be trusted.

135. Attendees at the Moneyline Dublin Pitch Meeting, including Eickholt, were assured that many of the investors were family or long-term friends of family, that they all trusted Matt and Matt would never betray their trust, and that they were investing just as those at the meeting were being invited to do.

136. On January 17, 2019, Eickholt issued check No. 1002 payable to Moneyline Analytics for the amount of approximately $75,000.00.

- 16 -

137.  Eickholt made the $75,000 additional contribution after he was led to believe investment would essentially double the value of his net investment.

138.  More specifically, Eickholt made the $75,000 additional contribution in large part to meet the goals of the new Moneyline affiliate group as described by Matt, as Matt had indicated that if the Moneyline affiliate's pot could reach approximately $2 million, Matt could assure investors a dramatic increase in annual profit, specifically from the historical return of 18-20% per year to approximately thirty percent (30%) per year.

139.  Approximately Spring of 2019, Moneyline issued another statement for Eickholt showing, as of April 30, 2019, a combined investments value for Eickholt of more than approximately $150,000.00, with a note that, "We have filled the required $2M amount – now we start the bonus fund!"

140.  Next, Moneyline issued a mid-year statement for Eickholt showing investment values as of July 15, 2019, of a combined more than approximately $160,000.00, with a note that "Next report date will be early October."

141.  Moneyline then issued a K-1 to Eickholt for 2019 (the "Eickholt 2019 Moneyline K-1") showing earnings on Eickholt's investment.

142.  These statements are consistent with reporting and/or statements received from Moneyline and/or Edgewize and/or Matt and/or Sonya showing income of approximately twenty percent (20%) per year prior to that point, as past performance was used as one of the strongest indicators of the ability to generate twenty percent (20%) return for investors over time.

143.  Furthermore, Matt represented to Eickholt that the "bonus fund" refers to additional revenue the Moneyline Dublin project would receive because of Eickholt's, among others', favored position as early investors and "family and friends"; meanwhile, for subsequent investors, Matt indicated returns of approximately 12%, a reduction of later investor returns (approximately from 20% to 12%) to benefit the earlier investors and specifically the Moneyline Dublin investors.

144.  Moneyline issued a statement to Eickholt for 2019 showing investment values as of December 31, 2019, of approximately $85,361.00 and approximately $87, 612.00.  On this statement is a note that "Another great year for MLA!"

- 17 -

145.    During 2020, Matt indicated to Eickholt that everything was going strong and did not indicate any performance issues were expected, going so far as to characterize the COVID-19 pandemic's impact on sports as a blessing because of Japanese baseball, as well as expanded options for wagering on hockey and soccer.

146.    On or about October 27, 2020, Eickholt received email correspondence from Matt wherein Matt described, among other things, "we are able to get your numbers close to what they've been for 7 straight years . . ." and also asked investors to visit him, noting "you'd come away with a strong feeling about the investment I have no doubt."

147.    Moneyline issued a statement to Eickholt for 2020 showing projected total investment value as of December 31, 2020, of approximately $190,443.00.  On this statement is a note from Matt that "we . . . still eked out a double-digit return."

148.    In or about May 2021, Matt promised Eickholt a K-1 for calendar year 2020, but none was ever received.

149.    Eickholt relied on documentation received from Matt and/or Moneyline and/or Edgewize and/or Sonya to prepare and pay taxes.

150.    No monies were ever received back to Eickholt from Matt and/or Sonya and/or Moneyline and/or Edgewize.

151.    Over the course of time, and throughout the period in which Eickholt invested, Matt consistently represented to Eickholt that the investment is really good—if not fail safe—because any defects or contingencies related to the mathematics and/or probability covered potential issues. Upon information and belief, Matt told Eickholt all the angles were worked out.

152.    Furthermore, Matt told Eickholt that the investment always produces a thirty percent (30%) return, making it easy to represent to Clients that they could expect returns ranging from 12-18%.

153.    Matt furthermore pressed Eickholt to consider that this expected return of thirty percent (30%) meant twenty-five percent (25%) to the investor and five percent (5%) to Matt.

14749-01/2668176_7.docx

HOLLEY DRIGGS

154.    In terms of how the return was made, Matt relayed to Eickholt that he performed micro-bets—for which Matt assured he always had enough money to back up these bets; meaning, he could always keep betting and, ultimately, win.

155.    Upon information and belief, Matt and/or Sonya and/or Moneyline wanted to keep investments under approximately $5 million, to not trigger reporting requirements.

156.    However, at no time during the years-long ongoing dialogue with Eickholt did Matt or Sonya mention or provide a sense that there was risk to the investments Eickholt was making.

157.    On the contrary, Matt and/or Sonya consistently represented to Eickholt that returns were positive, even promising high returns.

158.    Matt made repeated assertions that his system was foolproof.  Specifically, he used a technique of micro wagering backed by a very large purse.  Matt represented that, with this technique, he would assert that ultimately the laws of probability will guarantee a payoff. This technique was described on virtually every occasion Eickholt met with Matt, at which Matt also described the safety and certainty of investing in his sports betting projects.

159.    In or about May 2021, Matt wrote in a final text message to Eickholt that Matt had a company giving him a hard time and he could not have client communications at the time. Eickholt still believed his investment was intact and thought the bankruptcy involved a different company.

160.    In or about May 2021, when Eickholt learned of Moneyline bankruptcy, he sent an email to Matt with formal demand for return of money, but did not receive a response or any money.

161.    In 2021, in testimony at a § 341 meeting of creditors, when Eickholt questioned Matt about the specifics of his micro-wagering technique, and, upon information and belief, Matt responded with testimony regarding a time in 2015 when the fund was in distress whereby Matt made large wagers as opposed to micro-betting.  This testimony concerning 2015 was the first information Eickholt ever received that there may have been distress.

162.    Upon information and belief, Matt did not, after 2015, abandon his advertised technique.    Furthermore, at no time between 2015 and his 2021 testimony did Matt divulge potential risk for Eickholt or Eickholt's investments.

163.    At no time during the course of Eickholt's investments with Matt, Edgewize, Moneyline, or the Known Affiliates, did Matt disclose he was making major bets to try and get the company or companies back to solvent.

164.    Matt used his relationship to and affiliation with the Known Affiliates in furtherance of his scheme to defraud Eickholt.

165.    Matt used his relationship to and affiliation with Sonya in furtherance of his scheme to defraud Eickholt.

166.    Sonya used her relationship to and affiliation with the Known Affiliates in furtherance of her scheme to defraud Eickholt.

167.    Sonya used her relationship to and affiliation with Matt in furtherance of her scheme to defraud Eickholt.

168.    Upon information and belief, all of Eickholt invested funds have been embezzled, spent, and/or otherwise disposed of by the Debtors, and Eickholt lost funds as a result of the Debtors' fraudulent scheme.

169.    Upon information and belief, all or nearly all of the funds invested by Eickholt were gone, and did not exist in the amounts stated at the time such statements, financial statements, reports, and K-1s were received by Eickholt from Matt and/or Sonya and/or Moneyline and/or Edgewize.

170.    Upon information and belief, all of the statements, financial statements, reports, and K-1s received by Eickholt were generated by Matt and/or Sonya and/or Moneyline and/or Edgewize and portrayed false information concerning Eickholt investment funds.

171.    As a result of, *inter alia*, the foregoing, plus any taxes and/or liabilities and/or penalties thereupon, the Debtors incurred a debt owed to Eickholt (the "Eickholt Debt").

- 20 -

14749-01/2668176_7.docx

**FREEMAN**

172.    On or about April 6, 2016, Freeman entered into an Investor Agreement with Moneyline.

173.    Upon information and belief, on or about April 16, 2016, Matt sent Freeman an additional agreement changing the terms of the fee structure, with Advantage receiving payments as part of a schedule, then with Freeman (and Moneyline) paid a portion of gross profits.

174.    It is unknown whether and to what extent Matt, Moneyline, and/or Sonya abided by these terms.

175.    Based on additional representations made to Freeman, on or about April of 2016, Freeman was led to believe that his investment will return at a minimum ten percent (10%).  A K-1 for 2016 for Moneyline was prepared (the "Freeman 2016 Moneyline K-1"), showing a profit of approximately $18,520.00 to Freeman.

176.    Freeman received multiple 2017 statements from Moneyline relating to his investment.  In one, dated as of about December 31, 2017, a Moneyline statement shows a starting investment amount of approximately $100,000.00; four figures in earnings, and a total investment value along with a note that "Next reporting date will be 8/15. . . . Thank you for being part of the program."

177.    Another Moneyline statement shows an investment value increasing by five figures, resulting in a value of approximately $114,301.00 as of December 31, 2017; accompanying these written statements is a note that the next report will be issued on "1/31…and they'll start coming at months' end for 2018."

178.    Over time, Freeman was told repeatedly by Moneyline that there would be a website created through which Freeman could download all reports and track all fund investments, but the website was never functional and/or accessible when Freeman tried.

179.    In or about 2016, upon information and belief Freeman withdrew some of his investment funds but re-invested approximately $100,000.00.

180.    Freeman received a K-1 for 2017 for Moneyline, upon information and belief prepared by John Amundson of CliftonLarsonAllen LLP (the "Freeman 2017 Moneyline K-1"),

- 21 -

in which the revised beginning capital account of approximately $100,000.00 was shown with a current year increase of approximately $14,301.00 for a total of approximately $114,301.00.

181.    A K-1 for 2018 for Moneyline was received by Freeman, upon information and belief prepared by CliftonLarsonAllen LLP (the "Freeman 2018 Moneyline K-1"), showing a beginning capital account of approximately $114,301.00, a current year increase of approximately $19,728.00, and an ending capital account of approximately $134,029.00.

182.    A K-1 for 2019 for Moneyline was received by Freeman, upon information and belief prepared by CliftonLarsonAllen LLP (the "Freeman 2019 Moneyline K-1"), showing a beginning capital account of approximately $134,029.00, a current year increase of approximately $24,795.00, and an ending capital account of approximately $158,824.00.

183.    Freeman prepared and paid taxes based on the K-1s provided to Freeman.

184.    A December 31, 2020, statement for Freeman issued by Moneyline stated Freeman's investment earned five figures in 2020, noting a projected total value of investment of approximately $177,882.00 as of December 31, 2020 (the "Freeman 2020 Moneyline Statement").

185.    On the Freeman 2020 Moneyline Statement is a note from Matt asking Freeman to provide a new username for the Moneyline website.  No indication is made that Moneyline was failing.

186.    Documents filed in the Moneyline Case at Schedule E/F: Creditors Who Have Unsecured Claims, show a debt for approximately $158,824.00 owed to Freeman—this corroborates the amount as reflected on the Freeman 2019 Moneyline K-1. Similarly, documents filed in the Turnipseede Case at Schedule E/F: Creditors Who Have Unsecured Claims also show a debt owed to Freeman for approximately $158,824.00, this same amount.

187.    Freeman relied on documentation received from Matt and/or Moneyline and/or Sonya to prepare and pay taxes.

188.    Matt used his relationship to and affiliation with the Known Affiliates in furtherance of his scheme to defraud Freeman.

189.    Matt used his relationship to and affiliation with Sonya in furtherance of his scheme to defraud Freeman.

- 22 -

14749-01/2668176_7.docx

190.    Sonya used her relationship to and affiliation with the Known Affiliates in furtherance of her scheme to defraud Freeman.

191.    Sonya used her relationship to and affiliation with Matt in furtherance of her scheme to defraud Freeman.

192.    Upon information and belief, all of Freeman invested funds have been embezzled, spent, and/or otherwise disposed of by the Debtors, and Freeman lost funds as a result of the Debtors' fraudulent scheme.

193.    Upon information and belief, all or nearly all of the funds invested by Freeman were gone, and did not exist in the amounts stated at the time such statements, financial statements, reports, and K-1s were received by Freeman from Matt and/or Sonya and/or Moneyline.

194.    Upon information and belief, all of the statements, financial statements, reports, and K-1s received by Freeman were generated by Matt and/or Sonya and/or Moneyline and portrayed false information concerning Freeman investment funds.

195.    As a result of, *inter alia*, the foregoing, plus any taxes and/or liabilities and/or penalties thereupon, the Debtors incurred a debt owed to Freeman (the "Freeman Debt").

**NORTH**

196.    In her capacity as assistant to Weihe, North first met Matt the summer of 2013 when Matt visited Weihe.  By reason of her work with and employment by Weihe, North was present when Matt spoke to Weihe of sports wagering and made statements respecting unbelievable returns. At that time Matt was representing returns had been over thirty percent (30%). Consistently thereafter, whenever North was present during conversations between Weihe and Matt, North heard Matt refer to his wager technique as a program, that even though returns had fallen to the low-20% percent range, Matt believed he could get returns back up to the range of 30%.

197.    Furthermore, Matt described the difference between projections and actual returns as attributable to his wagering more conservatively to test out programs.

198.    Later, in a November 3, 2015 writing (the "November 2015 Announcement") announcing the transition from Edgewize to Moneyline,[5] Matt also described a new collaboration with Graham in which during a two-month trial period from April 5 to May 27 the amount of "$1,000 invested was worth $1,530.  A 53% return in just 59 days."  Matt later described, "By September 29th of this year, that $1,000 invested was worth $30,000.  Truly remarkable."  Matt further describes Graham's involvement with Matt in Moneyline, as opposed to Matt's solo involvement in Edgewize.

199.    Upon information and belief, Matt and/or Sonya never had or operated separate bank accounts for Moneyline and/or Edgewize and/or Dublin, despite representations as to any separateness of these entities.

200.    Upon information and belief, Matt and/or Sonya did not keep monies, wagers, business activity separate for Moneyline and/or for Edgewize and/or for Dublin, despite representations to the contrary.

201.    In this same November 2015 Announcement, Matt stated, "as the steward of your money in this realm, I would advise you to at least place 1/2 your investment with the MLA style come April…but this is up to you.  Again, I'll be calling you personally to better engage this topic."

202.    Matt emphasized in this writing: "**Important: since I am the sole owner of both strategies, nothing will affect my pay. . . I am in charge of, and operating both strategies, . . . ."

203.    In the fall of 2013, North invested approximately $2,500.00 with Matt in connection with Edgewize.

204.    Upon information and belief, North was informed by Matt that the return on her $2,500.00 investment was over twenty percent (20%) its first year.

205.    As a matter of course, North never liquidated gains or withdrew her investments out of Edgewize, Moneyline, or Dublin, but rather rolled over investments each year.

---

[5] Which writing was received by more than one of the Plaintiffs.

206. Upon information and belief, over the next year or two, North gave Matt a minimum of approximately $17,500.00 but possibly more, only stopping when informed the value of her invested funds (including earnings) amounted to approximately $20,000.00.

207. In or about 2015, Matt changed Edgewize to Moneyline. North was not asked for her consent to her investments being moved to Moneyline, but rather became aware of first a name change then an EIN change the following year.

208. Over the years, Matt's reporting had dwindled from quarterly to annually. North, along with Weihe and others, pressed Matt for a bookkeeper and certified public accountant to keep up with reporting, but consistently over a course of years Matt would say he hired people or he has people helping him but would not explain their role.

209. Against this background, on or about January 5, 2016, Matt announced Sonya's hiring as the Vice President of Data Management and identified Sonya's responsibility in providing year-end reporting for investors (the "2016 Sonya Announcement").

210. In the 2016 Sonya Announcement, Matt describes Sonya as, among others, having a bachelor's degree in Economics and also an MBA. Specifically, "With this new position [Sonya] will be handling the reporting, and the taxes (yes, they will be on time this year . . .), as running the new programs I emailed you all about for this coming baseball season." Matt also noted, "she's perfect for this environment . . . ."

211. Moneyline issued a K-1 to North for 2016 (the "North 2016 Moneyline K-1"), showing increase in investment value by approximately $5,160.00, resulting in a total investment value of approximately $28,295.00.

212. Moneyline issued a K-1 to North for 2017 (the "North 2017 Moneyline K-1") showing an increase in investment value by approximately $4,687.00, resulting in a total investment value of approximately $35,934.00.

213. In or about 2018, Matt asked investors for new monies to start a Moneyline affiliate, Dublin and, upon information and belief, asked several investors for new money, including North.

214. In connection with this dialogue with Matt, it is believed that North's investments funds were to be transitioned to Moneyline Dublin project. Under the specific circumstances of

- 25 -

the transfer and an ensuing agreement, North understood from Matt's representations this development would bring North a thirty percent (30%) return when investors hit a $2 million mark.

215. On or about November 27, 2018, North received email correspondence from Matt respecting the Moneyline Dublin project wherein Matt described "we are starting our new project January 1, 2019"; a website was developed; Matt had formed a new LLC "for our Dublin group"; North could expect to receive a "new Operating Agreement pertinent to our project[]"; and that "commitments" (*i.e.*, investments) needed to be paid with funds sent to Moneyline at an address in Las Vegas, Nevada.

216. Moneyline issued a K-1 to North for 2018 (the "North 2018 Moneyline K-1") showing an increase in investment value by approximately $6,491.00, resulting in a total investment value of approximately $42,425.00.

217. On or about March 27, 2019, North received email correspondence from Matt describing "News & Updates" related to the Moneyline Dublin project, in which Matt described, "Money is still coming in to reach the goal of $2M – we are very close…I'd estimate another $40k would get us there!" This correspondence also pressed recipients to "If you have people that might be interested, please reach out to me…or give them my information…" noting Matt was "in Washington DC Today – meeting with 5-7 people tonight…and should they join, will be the first 'public' entries into our new MLA DUB LLC project! In essence…we're off and running on the 'bonus side' of the project!" In this correspondence Matt also referenced "brackets . . for the tournament" noting "at least the company is spot on!!"

218. North also received a Primary Investor Information & Operating Agreement for "Moneyline Analytics – Dublin Branch (MLA DUB LLC)" dated approximately January 2019, identified as prepared by Matt.

219. Moneyline issued a K-1 to North for 2019 (the "North 2019 Moneyline K-1") showing increase in investment value by approximately $7,552.00, resulting in a total investment value of approximately $49,977.00.

220.    Upon information and belief, in or about 2019, a few investors developed Fusion, with Graham as the Chief Financial Officer and Matt doing the wagering, in which Weihe had invested approximately $50,000 for North's benefit.

221.    Upon information and belief, Matt and/or Sonya ultimately embezzled funds from Fusion.

222.    On or about March 12, 2020, North, among others,[6] received email correspondence from Matt where he describes "We had another fabulous year – as the K1 will reflect – and I'm proud to say we will have another 2020 as our team has grown to 27 strong, and our algorithms and placement specialists are coming off record years in earnings . . ." (the "Matt March 2020 Email").  The Matt March 2020 Email further states there will be a 2-3 week delay to the start of the baseball season, "any NHL shutdowns won't affect the fund[,]" "College basketball . . . was basically over[,]" and that although the NBA "is important to us, the real lifeblood of the company is Major League Baseball, and the delay to the season will not affect our earnings in any foreseeable way."

223.    In the Matt March 2020 Email, Matt emphasized "we're well funded for the delay[]" and "there will not be any additional stress on the program from an operations standpoint."

224.    In the Matt March 2020 Email, Matt states that Graham and Matt "have made the necessary algorithmic adjustments to move forward . . . and still make our fabulous numbers."

225.    In a correspondence dated on or about August 10, 2020, Matt describes, "We're doing great[]" and "MLA and the TEAM are working perfectly. . . ."

226.    On or about September 11, 2020, North received email correspondence from Matt in which Matt describes projects "are on par with my expectations, and some of our special projects are ahead of pace[.]"  Among other developments, this email correspondence announces that Graham and Olaf Vancura ("Vancura") "are both highly supportive of my Boards approach…which is great for us…."

---

[6] Multiple Plaintiffs received this correspondence.

227.    In or about October 2020, North received email correspondence in which Matt describes, among others, "we are able to get your numbers close to what they've been for 7 straight years . . . ."

228.    Upon information and belief, the lack of clarity or transparency surrounding status of investments was compounded by the alleged launch of a website for which North was required to provide login information, only to face a yet further different online system developed and/or launched by Moneyline allegedly in or about December 2020, although neither provided North with transparency in reporting of her investments.

229.    On or about December 11, 2020, North received an announcement from Matt, which describes, among others, certain Moneyline developments are "helping 2021 look far better!"

230.    On or about December 24, 2020, North received email correspondence from Matt, which describes a new website "almost ready to launch" and mentions only "I lost some business during the shutdowns, but maintained by core of great investors.  Now that all sports are back, I am rejuvenated to make these necessary improvements."

231.    Upon information and belief, this "new" website was never active for investors.

232.    Moneyline issued a statement to North showing four-figure earnings leading to a total value of investment as of December 31, 2020, of approximately $55,474.00.   On this statement is a Note from Matt: "Thanks for listening today! Let me know when your dates align… See you soon."

233.    Beginning approximately January 2021 Matt was further trying to solicit funds from North, among others, by inducing them to disinvest from Fusion and re-invest funds with Moneyline—however, North declined and resisted these persistent efforts.

234.    In or about January 2021, North spoke to Matt about taking approximately $10,000.00 out of her account and, later, followed up in or about April 2021 requesting the amount of withdrawal from her Moneyline account be increased to approximately $20,000.00, but repeatedly Matt put off providing these funds to North including telling her, among others, he had

- 28 -

put a "hold" on investor payouts in or about late January of 2021 which "may lift" with the start of baseball season.

235.   On or about March 25, 2021, Matt went to the Weihe residence and threatened Weihe and North to sign documents to remove Clay and put Matt in charge of Fusion, or else Weihe and North's investment funds in both ventures would be lost. Matt represented to North that Moneyline needed a cash injection that could only come from the means he proposed.  North expressed discomfort with Matt's proposal, but he persisted.

236.   Upon information and belief, at the time Matt came to the Weihe residence on or about March 25, 2021, Moneyline's accounts were closed and/or funds were gone.

237.   At no point during the conversation at the Weihe residence on or about March 25, 2021, did Matt state that Moneyline's accounts were closed, or that the investment funds of North and others were gone.

238.   North relied on documentation received from Matt and/or Moneyline and/or Edgewize and/or Sonya to prepare and pay taxes.

239.   Matt used his relationship to and affiliation with the Known Affiliates in furtherance of his scheme to defraud North.

240.   Matt used his relationship to and affiliation with Sonya in furtherance of his scheme to defraud North.

241.   Sonya used her relationship to and affiliation with the Known Affiliates in furtherance of her scheme to defraud North.

242.   Sonya used her relationship to and affiliation with Matt in furtherance of her scheme to defraud North.

243.   Upon information and belief, all of North invested funds have been embezzled, spent, and/or otherwise disposed of by the Debtors, and North lost funds as a result of the Debtors' fraudulent scheme.

244.   Upon information and belief, all or nearly all of the funds invested by North were gone, and did not exist in the amounts stated at the time such statements, financial statements,

reports, and K-1s were received by North from Matt and/or Sonya and/or Moneyline and/or Edgewize.

245.    Upon information and belief, all of the statements, financial statements, reports, and K-1s received by North were generated by Matt and/or Sonya and/or Moneyline and/or Edgewize and portrayed false information concerning North investment funds.

246.    As a result of, *inter alia*, the foregoing, plus any taxes and/or liabilities and/or penalties thereupon, the Debtors incurred a debt owed to North (the "North Debt").

**PHILLIPS**

247.    In or about October 2015, Phillips was introduced to Matt by a mutual acquaintance.

248.    At a dinner at Mastro's in Beverly Hills, Matt pitched the fund to Phillips, describing it as conservative and better performing than other investments and premised upon sports and sports gambling.

249.    At the dinner, Matt relayed to Phillips that, even though Matt's attorneys instructed him to not advertise this investment as a guarantee, it was a guarantee.

250.    Not long after the dinner, Matt emailed Phillips with an account sheet noting Moneyline's and/or Edgewize's progress, and inquiring further of Phillips' interest in investing.

251.    Next, on or about November 10, 2015, Matt emailed Phillips with an account sheet from a representative client; an legal opinion letter dated August 23, 2013, to Edgewize, signed by James H. Bownas of Lane, Alton & Horst, LLC; and an Investor Information & Operating Agreement for Moneyline.

252.    Based upon the emailed representations and others made by Matt and/or Moneyline, Phillips invested approximately $10,000.00 ("Phillips Initial Investment"), which Matt had told Phillips was the minimum for entry.

253.    On or about December 16, 2015, Phillips received email correspondence from Matt acknowledging receipt of the approximately $10,000.00, stating "you've already earned", and requesting information for the K-1 statement.

254.    On or about February 6, 2016, Phillips received a statement dated January 31, 2016, in an email from Sonya that identified Sonya as "VP of Data Management" with Moneyline and stated Phillips' investment had earned $171.09 for a total investment value as of January 31, 2016, of approximately $10,243.09, resulting in a 20.01% "Current Annual Return Rate" for a thirty-one day "Deal Period."

255.    On or about June 21, 2016, Phillips invested approximately $10,000.00 ("Phillips Second Investment") with Moneyline.

256.    Later, Phillips requested a statement showing the Phillips Second Investment. On or about November 7, 2016, Phillips received a Moneyline statement from Sonya showing the June 2016 Investment had, as of November 7, 2016, earned approximately $740.00, for a total investment value as of November 7, 2016, of approximately $10,740.00, and the Phillips Initial Investment showing totaled approximately $11,772.00.

257.    As with the previous statement issued by Moneyline, Phillips was provided with a Current Annual Return Rate for investments to date (showing 19.96% as of November 7, 2016).

258.    On or about December 21, 2016, Phillips invested another approximately $20,000.00 ("Phillips Third Investment").

259.    Moneyline issued a statement for the period ending December 31, 2016, in which the Phillips Initial Investment, the Phillips Second Investment, and the Phillips Third Investment were shown to each have accrued either three- or four-figure amounts, with total investments of approximately $43,210.00.

260.    Sonya provided Phillips with the 2016 year-end statement for Moneyline and a number of other statements for Phillips' Moneyline investments in 2016.

261.    Moneyline issued a K-1 to Phillips for 2016 ("Phillips 2016 Moneyline K-1").

262.    On or about April 1, 2017, Phillips invested approximately $45,000.00 with Moneyline ("Phillips Fourth Investment").

263.    On or about April 15, 2017, Sonya provided a Moneyline statement to Phillips reflecting all four Phillips investments to date and reflecting three- or four-figure increases in investment values across all Phillips investments with Moneyline, as of April 15, 2017.

- 31 -

264. On or about June 27, 2017, Phillips received email correspondence from Matt in which Matt stated, "We are growing!" and provided the "squad of investors" with an update on training new employees, automation, and taxes, among others.

265. On or about July 7, 2017, Phillips invested approximately $20,000.00 with Moneyline ("Phillips Fifth Investment").

266. On or about July 15, 2017, Sonya provided Phillips with Moneyline statement, which did not reference the Phillips Fifth Investment.

267. On or about January 11, 2018, Sonya provided Phillips with another Moneyline statement, showing four-figure earnings during 2017 on each of Phillips' five investments with Moneyline, amounting to a total investment value as of December 31, 2017, of approximately $122,234.00.

268. On or about March 9, 2018, Phillips received email correspondence from Matt asking for personal information to forward to "My accountant", which email bears the subject line "K1's".

269. On or about March 11, 2018, Phillips received email correspondence from Matt discussing "Tax update", noting that Matt "ha[d] submitted everything for the partnership returns...." and encouraging recipients to "use the number you were given on your 12/31 end-of-year report if you can't wait."

270. On or about March 30, 2018, Phillips received a K-1 for 2017 from Moneyline ("Phillips 2017 Moneyline K-1"), prepared by John Amundson of CliftonLarsenAllen LLP and showing investment value of approximately $122,234.00, of which approximately $14,134.00 was described as an increase.

271. During 2018, Matt pressed Phillips to encourage and bring to Moneyline additional investors. On or about February 23, 2019, Phillips received email correspondence from Matt regarding K-1 statements, the introduction of Brett Lovett (described as a "5+ year client") to the team, and the website.

272. On or about February 27, 2019, Phillips received from Matt a Moneyline statement showing investment value as of approximately $122,234.00 had earned approximately $22,003.00,

- 32 -

amounting to a total investment value as of December 31, 2018, of approximately $144,237.00, with a Note on the statement and in the subject line of the email referencing "end of year number[] for tax purposes."

273.    Encouraged by the repeated past performance and continued increase in all five prior investments, on or about December 30, 2019, Phillips invested approximately $55,000.00 ("Phillips Sixth Investment") to Moneyline.

274.    On or about January 26, 2020, Phillips received from Matt a Moneyline statement showing investment value as of December 31, 2019, of approximately $169,915.00, which total amount included approximately $25,678.00 in gains made during 2019.

275.    On or about March 6, 2020, Matt sent a statement dated as of February 29, 2020 and wrote "This includes your latest investment of $55,000"; however, among other issues, this did not reflect the Phillips Sixth Investment.

276.    Phillips and Matt corresponded by email, and Matt responded, acknowledging again that the Phillips Sixth Investment had been received and a revised statement addressing this would be issued "asap."

277.    On or about March 12, 2020, Phillips received email correspondence from Matt regarding K-1 statements scheduled to be sent the following week, stating, in part, that "We had another fabulous year as the K1 will reflect[.]"  In this correspondence, Matt further indicated that the "algorithms are built to function off of certain filters and portals that can simply be adjusted to fit the number of days [Major League Baseball] decides to play, and we're well funded for the delay."

278.    On or about March 20, 2020, Phillips received email correspondence from Matt stating Matt's team was working on a skeleton crew, but that the K-1s were being processed and would be sent at soon as Matt received them.

279.    Phillips received from Matt a K-1 for Moneyline for 2019 prepared by CliftonLarsonAllen LLP (the "Phillips 2019 Moneyline K-1"), reflecting an approximately $25,678.00 increase resulting in investment value of approximately $169,915.00.

280.    On or about January 4, 2021, Phillips received from Matt a Moneyline statement showing approximately $139,904.00 in Phillips' account and a note that Matt had "managed a double-digit return despite missing an entire quarter…and I know 2021 will be back on track"; for unexplained reasons this statement does not reflect the balance shown on the Phillips 2019 Moneyline K-1 or its corresponding end-of-year 2019 Moneyline statement for the Phillips investments.

281.    On or about January 9, 2021, Phillips invested an additional approximately $100,000.00 with Moneyline (the "Phillips Seventh Investment"), bringing Phillips' total investment to approximately $239,904.00.

282.    Phillips did not receive any additional statements or tax forms showing the approximately $100,000.00 Phillips Seventh Investment was accounted for by Moneyline, Matt, or Sonya.

283.    During February 2021 Phillips emailed with Matt requesting his K-1 for the year 2020 and received response from Matt that, "I've been compiling the data for accountants – I don't think it'll take too much longer – I have submitted everything and am just awaiting word."

284.    Phillips did not receive a K-1 for 2020 or 2021.

285.    On or about March 27, 2021, Phillips golfed with Matt and a businessman from Northern California described as one of Matt's regular golfing friends, at Red Rock Country Club in Las Vegas.  During that outing, Matt told Phillips that Moneyline was "doing great."

286.    On or about May 12, 2021, Matt and Phillips spoke by telephone and Matt indicated that he was filing for bankruptcy as a way to protect the Moneyline money from angry investors in another fund, who alleged that he was commingling the funds.  This was the first Phillips had heard of any of this.  Matt said the money for Moneyline was still there and this filing was a defensive mechanism to protect the money from expected lawsuits from investors in the other fund, who he said had lost money.  Matt told Phillips that everything Matt had was invested in Moneyline, and if Phillips didn't get paid, Matt wouldn't get paid, so, not to worry.

287.    Upon information and belief, none of Matt's statements to Phillips were true.

- 34 -

288.    On or about May 13, 2021, Moneyline filed for bankruptcy. Matt claimed to Phillips that the fund was totally bankrupt.

289.    On or about Monday May 17, 2021, Phillips texted Matt noting the approximately $100,000.00 discrepancy associated with the Phillips Seventh Investment but never received a response.

290.    Matt never responded, and there has been no further communication.

291.    Phillips relied on documentation received from Matt and/or Moneyline and/or Edgewize and/or Sonya to prepare and pay taxes.

292.    Matt used his relationship to and affiliation with the Known Affiliates in furtherance of his scheme to defraud Phillips.

293.    Matt used his relationship to and affiliation with Sonya in furtherance of his scheme to defraud Phillips.

294.    Sonya used her relationship to and affiliation with the Known Affiliates in furtherance of her scheme to defraud Phillips.

295.    Sonya used her relationship to and affiliation with Matt in furtherance of her scheme to defraud Phillips.

296.    Upon information and belief, all of Phillips invested funds have been embezzled, spent, and/or otherwise disposed of by the Debtors, and Phillips lost funds as a result of the Debtors' fraudulent scheme.

297.    Upon information and belief, all or nearly all of the funds invested by Phillips were gone, and did not exist in the amounts stated at the time such statements, financial statements, reports, and K-1s were received by Phillips from Matt and/or Sonya and/or Moneyline and/or Edgewize.

298.    Upon information and belief, all of the statements, financial statements, reports, and K-1s received by Phillips were generated by Matt and/or Sonya and/or Moneyline and/or Edgewize and portrayed false information concerning Phillips investment funds.

299.    As a result of, *inter alia*, the foregoing, plus any taxes and/or liabilities and/or penalties thereupon, the Debtors incurred a debt owed to Phillips (the "<u>Phillips Debt</u>").

- 35 -

**PINNELL**

300.    Pinnell received a letter dated approximately January 2018 issued by Lane Alton, Attorneys at Law, addressed to Moneyline regarding "Transacting Business in Nevada", signed by a James H. Bownas ("Bownas"), in which Moneyline's organizational structure, leadership, business model, and the legality were discussed and in which it stated that neither Matt nor Moneyline are "in violation of Nevada statutes or regulations relating to so called 'messenger betting' by virtue of placing wagers on behalf of [Moneyline]."

301.    Pinnell also received an Investor Information & Operating Agreement dated approximately January 2018 noting, "Prepared by: Matthew J. Turnipseede[,] President."

302.    On or about October 25, 2018, Pinnell issued check No. 0738 in the amount of approximately $100,000.00 payable to Moneyline.

303.    On or about October 27, 2018, Matt sent email correspondence to Pinnell's assistant Ms. Cheryl Wasserstrom ("Wasserstrom"), mentioning that Matt had met her on or about October 25, 2018; acknowledging receipt of Pinnell's approximately $100,000.00; and forwarding copies of requested documents including an operating agreement.

304.    Sometime after December 31, 2018, Pinnell received a Moneyline statement prepared for Pinnell showing that, as of October 29, 2018, Pinnell's investment of approximately $100,000.00 had accrued earnings through December 31, 2018, of approximately $3,434.00, amounting to a total of approximately $103,434.00 as of year-end 2018 (the "Pinnell 2018 Recap"). The Pinnell 2018 Recap bears annotation from Matt stating, "I look forward to seeing you on the 15th at the Weihe house."

305.    A 2018 K-1 was issued for Pinnell from Moneyline, showing capital contributions of approximately $100,000.00 with earnings of approximately $3,434.00 for a total of approximately $103,434.00 (the "Pinnell 2018 Moneyline K1"). The Pinnell 2018 Moneyline K-1 states on its face it was prepared by John Amundson at CliftonLarsonAllen LLP. Pinnell later received a 2019 K-1 from Moneyline also prepared by CliftonLarsonAllen LLP.

306.     In February 2019, Wasserstrom (on behalf of Pinnell) corresponded several times with Matt regarding Pinnell's ability to log in to an investor website Matt had described. After obtaining access, no valuable information pertinent to Pinnell's monies could be located.

307.     On or about February 15, 2019, Matt and Wasserstrom corresponded concerning discussions Matt and Pinnell had had; in connection with further meet-up efforts, Matt ultimately stated, "We actually do not need to meet for her to execute her plans. . . . CHECK TO: Moneyline Analytics, LLC . . . ."

308.     On or about February 19, 2019, Matt corresponded with Wasserstrom (on behalf of Pinnell), discussing Pinnell's additional forthcoming investment, and in follow-up correspondence the same day, Matt stated, "I am taking 2 types of investments . . . ."

309.     On or about February 22, 2019, Pinnell issued check No. 0855 in the amount of approximately $200,000.00 payable to Moneyline.

310.     On or about October 15, 2019, Pinnell issued check No. 0988 in the amount of approximately $20,000.00 payable to Moneyline.

311.     Pinnell received multiple statements from Moneyline for calendar year 2019, which statements referenced an original "investment value" of approximately $103,434.00 on January 1, 2019, had increased to approximately $121,848.00 as of December 31, 2019, and that her supplemental investment of approximately $200,000.00 on or about February 26, 2019, had increased to approximately $229,883.00.

312.     Pinnell received a 2019 K-1 prepared by CliftonLarsonAllen LLP for Moneyline (the "Pinnell 2019 Moneyline K-1"), showing a beginning capital account of approximately $103,434.00; capital contribution of approximately $200,000.00; income of approximately $48,297.00; and a total of approximately $351,731.00.[7]

313.     On February 17, 2020, Matt sent an email (the "Matt 2/17/2020 Email") to Pinnell, among others, identifying her as one of the "'Originals' in the Dublin MLS Fund" and soliciting additional investment by stating she will stay in the "'originals' plan" if she increases her

---

[7] Upon information and belief, where and how Moneyline, Matt, and/or Sonya accounted for Pinnell's October 2019 additional approximately $20,000.00 investment is still not known.

"position."  The Matt 2/17/2020 Email identified among its "Topics for review" as "The proper way to grow the fund."

314.    On or about September 11, 2020, Matt sent an email (the "Matt 9/11/2020 Email") to Pinnell, among others, in which Matt spoke to "my MLA Team, my MLA DUB squad, and the Fusion clients!" in which Matt discussed in detail his current business and referenced ongoing work with, among others, Graham and Vancura.  In the Matt 9/11/2020 Email, Matt self-identified as "a good steward of your investment," and noted a desire to share "our plans for 2021" and to have recipients of the email come to Las Vegas to, among other things, "watch my staff create your wealth[.]"

315.    On or about October 27, 2020, Pinnell received an email to "Matt Turnipseede" with the subject matter of "Update from Las Vegas!"  In this email, Matt described "we are able to get your numbers close to what they've been . . .", described "solid results" related to English Premier League betting; announced the commissioning of his new website; identified Sonya's prior involvement with Moneyline and announcing her transition; and representing that earnings were "currently trending around 14% with a clear path to bring that up to the 17/18% mark before 12/31 . . . ."

316.    Eventually, Pinnell received a K-1 for 2020 from Fusion.

317.    On or about March 30, 2021, Pinnell was informed by North of Matt's continued demand for "A substantial and much needed cash infusion to [Moneyline]" as well as Matt's ongoing dispute with Graham and Fusion.

318.    Over time, Pinnell was induced to invest approximately $470,000.00 with Matt and/or Moneyline and/or Sonya and/or the Known Affiliates.

319.    Sometime after December 31, 2020, Pinnell received a statement from Moneyline prepared for Pinnell, stating, "While missing an entire quarter, we still managed double-digit returns[]" and identified Pinnell's investments as projected values of approximately $135,251.00 and approximately $255,170.00.

320.    Pinnell relied on documentation received from Matt and/or Moneyline and/or Sonya to prepare and pay taxes.

- 38 -

HOLLEY DRIGGS

321. Matt used his relationship to and affiliation with the Known Affiliates in furtherance of his scheme to defraud Pinnell.

322. Matt used his relationship to and affiliation with Sonya in furtherance of his scheme to defraud Pinnell.

323. Sonya used her relationship to and affiliation with the Known Affiliates in furtherance of her scheme to defraud Pinnell.

324. Sonya used her relationship to and affiliation with Matt in furtherance of her scheme to defraud Pinnell.

325. Upon information and belief, all of Pinnell invested funds have been embezzled, spent, and/or otherwise disposed of by the Debtors, and Pinnell lost funds as a result of the Debtors' fraudulent scheme.

326. Upon information and belief, all or nearly all of the funds invested by Pinnell were gone, and did not exist in the amounts stated at the time such statements, financial statements, reports, and K-1s were received by Pinnell from Matt and/or Sonya and/or Moneyline.

327. Upon information and belief, all of the statements, financial statements, reports, and K-1s received by Pinnell were generated by Matt and/or Sonya and/or Moneyline and portrayed false information concerning Pinnell investment funds.

328. As a result of, *inter alia*, the foregoing, plus any taxes and/or liabilities and/or penalties thereupon, the Debtors incurred a debt owed to Pinnell (the "Pinnell Debt").

**RIBEIRO**

329. Ribeiro was introduced to Matt and Moneyline through a mutual acquaintance.

330. Based on Matt's and/or Sonya's and/or Moneyline's representations, Ribeiro was led to believe that investing in Moneyline resulted in positive returns years over years. Ribeiro was approaching retirement and was looking for a stable and secure investment for the years after she stopped working.

331. On or about August 30, 2019, Ribeiro sent Matt a check for approximately $100,000.00 payable to Moneyline.

332.    Moneyline issued to Ribeiro a statement that showed an increase of approximately $6,605.00 for a total value of Ribeiro's investment as of December 31, 2019, of approximately $106,065.00.

333.    Ribeiro did not receive a K-1 from Moneyline for 2019.

334.    Next, Moneyline issued to Ribeiro a statement which showed further earnings of approximately $11,667.00 for a total value of Ribeiro's investment as of December 31, 2020, of approximately $117,732.00.  On this statement is a note from Matt to Ribeiro stating in part, "We still managed to squeeze out a double-digit return, . . .  Please send me a user name for my new website – you'll soon be able to access reports right from the site."

335.    On or about February 11, 2021, Ribeiro emailed Matt asking for a withdrawal of approximately $50,000.00 of Ribeiro's investment.  In this correspondence, Ribeiro identified a need to purchase a new vehicle, given her upcoming retirement, and perform upgrades on her house.

336.    On or about February 24, 2021, Matt responded to Ribeiro, replying that he was trying to get the balance of Ribeiro's investment as high as possible to "maximize your position[]," and he would continue to keep her posted as to when the money would be sent.

337.    Ribeiro did not hear further from Matt and/or Moneyline.

338.    On or about April 1, 2021, Ribeiro received email correspondence from Matt that the K-1 forms would be completed the following week.

339.    On or about April 1, 2021, and in light of what Ribeiro believed was an unacceptable amount of time to wait, she asked to withdraw the entire balance.

340.    Matt did not return Ribeiro's investment and instead replied stating he was in the process of a corporate restructure and would have more details soon.

341.    On or about May 12, 2021, Ribeiro received email correspondence from Matt stating that the K-1 forms should be ready the last week of May or first week of June.

342.    To date, Ribeiro has not received the K-1 for 2020.

343.    On or about May 13, 2021, at approximately 2:50 p.m. prevailing Central Time, Ribeiro emailed Matt again asking for the full amount of her investment to be returned to her, as

she had been waiting three months for the initial withdrawal requested.  Specifically, Ribeiro identified that, as a result of Matt's and/or Moneyline's delay in releasing her investment to her she has "gotten into debt, and . . . I am facing bills I have no money to pay, having the money with you.  I am an old person, retired, living alone, and the money I have with your company is ALL that I have been able to save in my lifetime.  Please be considerate . . . ."

344.    Ribeiro received no response from Matt.

345.    On or about April 28, 2021, Ribeiro, through her son, attempted to contact Matt, but the call was not answered, neither was the text message requesting status for Ribeiro's K-1 and check; except, approximately five days later, Matt stated that "information will be coming this week."  Further text message on or about June 9, 2021, likewise received no response from Matt.

346.    Ribeiro never received money back from the approximately $100,000.00 invested.

347.    Ribeiro relied on documentation received from Matt and/or Moneyline and/or Sonya to prepare and pay taxes.

348.    Matt used his relationship to and affiliation with the Known Affiliates in furtherance of his scheme to defraud Ribeiro.

349.    Matt used his relationship to and affiliation with Sonya in furtherance of his scheme to defraud Ribeiro.

350.    Sonya used her relationship to and affiliation with the Known Affiliates in furtherance of her scheme to defraud Ribeiro.

351.    Sonya used her relationship to and affiliation with Matt in furtherance of her scheme to defraud Ribeiro.

352.    Upon information and belief, all of Ribeiro invested funds have been embezzled, spent, and/or otherwise disposed of by the Debtors, and Ribeiro lost funds as a result of the Debtors' fraudulent scheme.

353.    Upon information and belief, all or nearly all of the funds invested by Ribeiro were gone, and did not exist in the amounts stated at the time such statements, financial statements, reports, and K-1s were received by Ribeiro from Matt and/or Sonya and/or Moneyline.

- 41 -

354.    Upon information and belief, all of the statements, financial statements, reports, and K-1s received by Ribeiro were generated by Matt and/or Sonya and/or Moneyline and portrayed false information concerning Ribeiro investment funds.

355.    As a result of, *inter alia*, the foregoing, plus any taxes and/or liabilities and/or penalties thereupon, the Debtors incurred a debt owed to Ribeiro (the "Ribeiro Debt").

**SCHUERGER**

356.    In or about Autumn 2014, Schuerger was introduced to Matt through a mutual acquaintance.  Matt presented to Schuerger a legal opinion from attorney James Bownas of the law firm Lane Alton, dated August 23, 2013, and titled "Transacting Business in Nevada", which described Matt's fund and how its operation was legal, along with an operating agreement.

357.    Matt's representations, verbal as well as the documents he provided Schuerger, as well as information relayed to Schuerger respecting the performance of Edgewize and/or Moneyline, induced Schuerger to invest over a period of time.

358.    More specifically, Matt expressly identified that the whole model of "micro-wagering" was to make sure losses were mitigated to never lose a big amount.

359.    On or about May 14, 2015, Schuerger invested approximately $18,000.00 in Edgewize.

360.    On or about May 26, 2015, Schuerger invested approximately $50,000.00 in Edgewize.

361.    On or about June 13, 2015, Schuerger invested approximately $40,000.00 in Edgewize.

362.    On or about December 29, 2015, Schuerger invested approximately $20,000.00 in Moneyline.

363.    Upon information and belief, Schuerger was informed by Matt that the "fund" was the same, only Matt had changed the name to Moneyline.

364.    After an initial total investment by Schuerger of approximately $128,000.00, Schuerger received a report from Moneyline indicating an investment value as of December 31, 2017, of approximately $351,303.00.

365.    On or about June 29, 2018, Schuerger invested approximately $100,000.00 in Moneyline.

366.    All told, Schuerger was informed his total investment value with Moneyline amounted to approximately $451,303.00, at which point Schuerger requested a return of his funds.

367.    Schuerger periodically stayed in contact with Matt and, ultimately, was induced to invest further in Moneyline.

368.    On or about March 12, 2020, Schuerger and others received email correspondence from Matt that, among other things, stated "We had another fabulous year . . . ."

369.    On or about March 20, 2020, Schuerger and others received email correspondence from Matt expressly stating that Graham and Matt were adjusting the algorithms and such adjustments "will not impact our expected return levels."

370.    On or about June 1, 2020, Moneyline and Buggy Holdings entered into that certain Investor Information & Operating Agreement ("MLA Agreement").

371.    Schuerger received an Investor Information & Operating Agreement, dated June 1, 2020, prepared by, and signed by, Matt as Managing Member and President of Moneyline.

372.    Pursuant to Moneyline's express representations and inducements, and past experience with his ability to redeem investments in Moneyline, on or about June 19, 2020, Schuerger invested approximately $200,000.00 in Moneyline.

373.    On or about June 22, 2020, Schuerger invested approximately $175,000.00 in Moneyline.

374.    Matt continued efforts to solicit Schuerger. For example, throughout June, July, and August 2020, Matt continuously represented that soccer wager placements were performing well and that other sports are, for example, "rolling now" and "proven to be the way to go."  At one point Matt said, "This has actually FORCED me to make incredibly eye-opening decisions that will earn new and [Moneyline] more money."

375.    Never during these correspondences, and other numerous conversations between Schuerger and Matt, did Matt indicate to Schuerger that Moneyline was in trouble or on the verge of insolvency.

- 43 -

376.    On or about August 25, 2020, Schuerger received email correspondence from Matt again indicating that the system was working and providing a "variety of extra-income opportunities . . . ."

377.    On or about September 20, 2020, Buggy Holdings entered into an operating agreement with Moneyline.

378.    On or about September 25, 2020, Matt further solicited Schuerger in email correspondence outlining a target projection of making approximately $51,000.00 in the last 102 days of 2020 with an investment of approximately $100,000.00, writing, "If we're able to come close to this, it will further solidify the genius behind the program…and set us up for life in a few short years."

379.    Schuerger later received an Investor Information & Operating Agreement, dated approximately September 2020, prepared by, and signed by, Matt as Managing Member and President of Moneyline.

380.    On or about October 19, 2020, Schuerger invested approximately $100,000.00 in Moneyline.

381.    On or about October 27, 2020, Schuerger received email correspondence in which Matt described that the addition of other sports was a boom for his "micro-wagering" model.

382.    Moneyline issued a statement to Schuerger showing the initial investment of approximately $375,000.00 earned approximately $161,739.00, resulting in an investment value of approximately $536,739.00 as of December 31, 2020, and showed the initial investment of approximately $100,000.00 earning approximately $27,480.00, to result in an ending balance of approximately $127,480.00, for a grand total from both investments of approximately $664,219.00.

383.    Schuerger had been told in writings with Moneyline and Matt that the approximately $475,000.00 invested with Moneyline would attain, through Moneyline's "micro wagering" strategy, certain investment targets Matt had described as conservative.

- 44 -

384.    Among these are statements made to Schuerger in writings received from Matt and/or Moneyline, such as June 2020 and September 2020 agreements, that describe investment targets.

385.    On or about December 27, 2020, Schuerger sent email correspondence to Matt specifically asking why the investments did not meet their targets.

386.    Throughout 2020, Matt communicated to Schuerger regularly that this was a record year, stating that the addition of other sports was a boom for his "micro-wagering" model.

387.    Matt did not signal to Schuerger that the Fund was in trouble or on the verge of insolvency.

388.    The total principal invested by Schuerger in Moneyline was approximately $475,000.00—yet Matt further pressed Schuerger to invest even more.  Specifically, the year-end statement provided to Schuerger clearly led Schuerger to believe that his investments in Moneyline amounted to approximately $664,219.00 as of December 31, 2020, showing great returns.

389.    Furthermore, the consistent dialogue Schuerger had with Matt throughout 2020 led Schuerger to believe that Moneyline was doing great.

390.    Upon information and belief, Moneyline was not doing great in 2020.

391.    Matt further targeted Schuerger by next inducing Schuerger to invest an additional approximately $200,000.00 on or about February 9, 2021, in an affiliate termed URGHN LLC ("Urghn"), which company was supposed to use Matt's "micro wagering" system in tandem with data from Kenneth White ("White"), an established oddsmaker and sports pick prognosticator.

392.    Upon information and belief, based on the momentum created by Moneyline and/or Matt and/or Sonya's representations, Matt suggested forming a new entity to use his "micro wagering" strategies with White's data.

393.    Upon information and belief, Matt was introduced to White by Greg Sidoris ("Sidoris"), a person identified by Matt as working with Moneyline.

394.    In furtherance of these continued efforts, on or about December 23, 2020, Schuerger received email correspondence from Matt containing a detailed hierarchy for the 2021 year, making it appear that the organization was growing and legitimate, to which Matt also

- 45 -

attached a spreadsheet showing investment program details.  Pursuant to the Urghn operating agreement, Matt would roll over Schuerger's Moneyline funds into Urghn, plus Schuerger's additional investment.

395.    Based on these statements and others made to Schuerger over a period of time primarily by Matt, Schuerger was induced to participate in Urghn.

396.    Upon information and belief, none of this was true.

397.    In or about March 2021, Schuerger surmised that Matt appeared agitated about an issue regarding Fusion, communicating Schuerger that Fusion was trying to sue him due to accounting discrepancies, but failing to explain to Schuerger how that impacted the remaining funds left from Schuerger's investments that were not with Fusion.

398.    On or about May 13, 2021, Moneyline scheduled "zero" assets in the Moneyline Case.

399.    Schedules filed in the Moneyline Case contradicted Matt's repeated representations made to Schuerger, among others, about funds being in the Moneyline account(s).

400.    On more than one occasion at this time, Matt spoke with Schuerger and stated Moneyline funds were protected, and that bankruptcy would be the best option for a quick resolution and present opportunity for investors like Schuerger to recoup funds.

401.    On or about May 6, 2021, Schuerger sent email correspondence to Matt insisting that Matt transfer the approximately $644,219.00 in Moneyline to Urghn.

402.    To date, Schuerger has received no information to indicate the disposition of the approximately $644,219.00 invested with Moneyline.

403.    Since approximately May 14, 2021, Matt has not communicated to Schuerger as to the approximately $644,219.00 in investment funds provided by Schuerger that were not returned to Schuerger.

404.    Over the course of time of Schuerger's investments with Moneyline, Schuerger had pressed Matt for greater transparency, such as setting up a website where investors can view funds in real time.  Matt responded to Schuerger with emails leading Schuerger to believe a website was being built to enhance transparency, only no such website was successfully launched.

405. On or about January 14, 2021, Matt sent email correspondence to the Urghn Management Team to discuss how the project will work and the pay percentages.

406. Thereafter, Matt and/or Moneyline induced Schuerger to participate in Urghn, including an additional investment induced by Matt and/or Moneyline, of approximately $350,000.00.

407. Schuerger relied on documentation received from Matt and/or Moneyline and/or Edgewize and/or Sonya to prepare and pay taxes.

408. Matt used his relationship to and affiliation with the Known Affiliates in furtherance of his scheme to defraud Schuerger.

409. Matt used his relationship to and affiliation with Sonya in furtherance of his scheme to defraud Schuerger.

410. Sonya used her relationship to and affiliation with the Known Affiliates in furtherance of her scheme to defraud Schuerger.

411. Sonya used her relationship to and affiliation with Matt in furtherance of her scheme to defraud Schuerger.

412. Upon information and belief, all of Schuerger invested funds have been embezzled, spent, and/or otherwise disposed of by the Debtors, and Schuerger lost funds as a result of the Debtors' fraudulent scheme.

413. Upon information and belief, all or nearly all of the funds invested by Schuerger were gone, and did not exist in the amounts stated at the time such statements, financial statements, reports, and K-1s were received by Schuerger from Matt and/or Sonya and/or Moneyline and/or Edgewize.

414. Upon information and belief, all of the statements, financial statements, reports, and K-1s received by Schuerger were generated by Matt and/or Sonya and/or Moneyline and/or Edgewize and portrayed false information concerning Schuerger investment funds.

415. As a result of, *inter alia*, the foregoing, plus any taxes and/or liabilities and/or penalties thereupon, the Debtors incurred a debt owed to Schuerger (the "Schuerger Debt").

- 47 -

**WEIHE**

416.    In or about 1990, Weihe met Matt through Matt's mother, Diane Prettyman. Weihe listened to Matt talk about wagering on sports betting over the years and in 2012 gave Matt some money to do a few bets while Matt was in Las Vegas on a trip.  After Matt did very well and brought returns of 35–45%, Weihe gave him more money.

417.    In or about 2013, Matt took it "professional" with a company called Edgewize Sports. Matt started with money from Weihe and another investor.

418.    Upon information and belief, Weihe invested over approximately $310,520.00 over an extended period of time lasting approximately eight years or more.  Among Weihe's investments in Edgewize and/or Moneyline are: approximately $20,000.00 invested on or about July 30, 2012, to Matt; approximately $10,000.00 invested on or about October 23, 2012, to Matt, paid via check No. 8851; approximately $8,520.00 invested on or about March 20, 2013, to Matt; approximately $52,000.00 invested on or about August 13, 2014, to Edgewize; approximately $50,000.00 invested on or about October 7, 2014, to Edgewize; approximately $20,000.00 invested on or about May 11, 2017, to Moneyline, paid via check No. 4954; and approximately $150,000.00 invested during calendar year 2020, to Moneyline (the "Weihe 2020 Investment"[8]).

419.    Upon information and belief, Weihe was specifically induced to provide the Weihe 2020 Investment related to Moneyline's affiliate Fusion.

420.    Upon information and belief, these are not all of the investments made by Weihe over the course of Weihe's relationship with Matt and/or Sonya and/or Edgewize and/or Moneyline, as it is believed that Weihe gave Matt more funds in person or perhaps sent directly from other accounts.

421.    In or about 2015, Matt created Moneyline, taking on more investors and, with this, Weihe gave Matt more money over the years.

---

[8] Upon information and belief, approximately $50,000.00 of this amount was earmarked for North, and from approximately April 2020 forward, such funds bore North's name and were treated as North's investment.

- 48 -

422.    Moneyline issued a statement to Weihe for 2016 in which was noted a beginning balance of approximately $192,118.00, upon which earnings of approximately $38,003.00 were said to be made, for a total investment amount of approximately $230,121.00.

423.    In or about 2018, Matt branched off Moneyline and, upon information and belief, asked several investors for new money, including Weihe.  In connection with communications with Matt, it is believed that Weihe's investments funds were to be transitioned to Moneyline Dublin project. Under the specific circumstances of the transfer and an ensuing agreement, Weihe understood from Matt's representations this development would bring Weihe 30% return. Matt's representations of these returns were an increase from the 14-18% Weihe had been receiving from Moneyline over the years.

424.    On or about November 27, 2018, Weihe received email correspondence from Matt respecting the Moneyline Dublin project wherein Matt described "we are starting our new project January 1, 2019"; a website was developed, Matt had formed a new LLC "for our Dublin group"; Weihe could expect to receive a "new Operating Agreement pertinent to our project[]"; and that "commitments" (*i.e.*, investments) needed to be paid, with funds sent to Moneyline at an address in Las Vegas, Nevada.

425.    In or about 2019, a similar, but more controlled, venture upon information and belief affiliated with Moneyline was ultimately developed into Fusion.  The Weihe 2020 Investment was provided pursuant to this understanding.

426.    On or about March 27, 2019, Weihe received email correspondence from Matt describing "News & Updates" related to the Moneyline Dublin project, in which Matt described, "Money is still coming in to reach the goal of $2M – we are very close…I'd estimate another $40k would get us there!"  This correspondence also pressed recipients to "If you have people that might be interested, please reach out to me…or give them my information…" noting Matt was "in Washington DC Today – meeting with 5-7 people tonight…and should they join, will be the first 'public' entries into our new MLA DUB LLC project!  In essence…we're off and running on the 'bonus side' of the project!"  In this correspondence Matt also referenced "brackets . . for the tournament" noting "at least the company is spot on!!"

- 49 -

427.    Moneyline issued a statement to Weihe showing a beginning balance of approximately $398,506.00, earnings of approximately $40,249.00, and an ending balance of approximately $438,755.00 as of December 31, 2020.

428.    On or about December of 2020, Weihe requested approximately $30,000.00 be withdrawn from their investments to pay for taxes.

429.    Weihe received a 2021 K-1 from Fusion noting a loss in income of approximately $21,028.00.

430.    In or about January 2021, in a telephone dialogue, Matt told Weihe that Matt wanted to lose Fusion and asked Weihe to move their money to Moneyline. Weihe agreed that, once Fusion was closed out properly, to move the investment funds to Moneyline.

431.    In or about March 2021, at a time when Weihe was in frail health, Matt came to Weihe's home and met with Weihe, among others, in which Matt threatened to remove Graham from Fusion and put himself (Matt) solely in charge. Weihe refused to do so, and Matt said the investments in both ventures would be lost.

432.    Upon information and belief, in 2018 Weihe took out approximately $30,000.00 of the funds invested, for a down payment on a house, but returned these funds to Matt less than three months later when the house purchase did not close.

433.    Weihe relied on documentation received from Matt and/or Moneyline and/or Edgewize and/or Sonya to prepare and pay taxes.

434.    Matt used his relationship to and affiliation with the Known Affiliates in furtherance of his scheme to defraud Weihe.

435.    Matt used his relationship to and affiliation with Sonya in furtherance of his scheme to defraud Weihe.

436.    Sonya used her relationship to and affiliation with the Known Affiliates in furtherance of her scheme to defraud Weihe.

437.    Sonya used her relationship to and affiliation with Matt in furtherance of her scheme to defraud Weihe.

- 50 -

438.    Upon information and belief, all of Weihe invested funds have been embezzled, spent, and/or otherwise disposed of by the Debtors, and Weihe lost funds as a result of the Debtors' fraudulent scheme.

439.    Upon information and belief, all or nearly all of the funds invested by Weihe were gone, and did not exist in the amounts stated at the time such statements, financial statements, reports, and K-1s were received by Weihe from Matt and/or Sonya and/or Moneyline and/or Edgewize.

440.    Upon information and belief, all of the statements, financial statements, reports, and K-1s received by Weihe were generated by Matt and/or Sonya and/or Moneyline and/or Edgewize and portrayed false information concerning Weihe investment funds.

441.    As a result of, *inter alia*, the foregoing, plus any taxes and/or liabilities and/or penalties thereupon, the Debtors incurred a debt owed to Weihe (the "Weihe Debt").

**WRIGHT**

442.    In or about December 2017, Wright was introduced to Matt through a mutual acquaintance.  In or about December 2017, Matt flew to Phoenix, Arizona, to specifically solicit Wright's investment in what is believed to be Moneyline.

443.    During Matt's time in Phoenix, Matt encouraged and solicited Wright's investment, raving to Wright about the proprietary betting algorithm for baseball and a history of twenty-plus percent annual returns.

444.    When Wright inquired specifically as to how bets were placed, Matt told Wright that Matt had several employees with accounts at all the major casinos who place the bets for him.

445.    On or about January 2, 2018, Wright received email correspondence from Matt containing wiring instructions for Wright to invest with Matt and/or Moneyline.

446.    On or about February 4, 2018, during a major football event hosted at the Lagasse Stadium, Matt further encouraged Wright's investment by discussing in additional details the investment strategy for Moneyline, including a proprietary baseball algorithm as well as expected returns.

- 51 -

447.    On or about February 7, 2018, Wright received email correspondence from Matt recapping most of their recent dialogue and addressing Wright's questions concerning timing of investment.

448.    In particular, Wright asked why he was being solicited to invest in February when the baseball season didn't start for approximately two months.

449.    Matt's response to Wright was that Moneyline's fund encompassed six sports (baseball, hockey, National Football League, collegiate football, National Basketball Association, and collegiate basketball) and is ongoing.

450.    Thereafter, and in reliance upon Matt's representations, on or about February 9, 2018, Wright wired approximately $150,000.00 to a Moneyline account at Wells Fargo, pursuant to Matt's instruction.

451.    A short time thereafter, Moneyline issued a statement to Wright showing a beginning investment value for Wright of approximately $150,000.00 earning approximately $6,329.00 during the respective timeframe, resulting in an investment value as of April 30, 2018, of approximately $156,329.00.

452.    Next, Moneyline issued a statement to Wright showing a beginning investment value for Wright of approximately $150,000.00 earning approximately $12,821.00 and resulting in an investment value as of July 15, 2018, of approximately $162,821.00.   Included in this statement is a reference to "Next report comes Sept. 1."

453.    Moneyline then issued a statement to Wright showing a beginning investment value for Wright of approximately $150,000.00 earning approximately $16,273.00 and resulting in an investment value as of September 1, 2018, of approximately $166,273.00.   Matt included a personal note on this statement mentioning teams and the Super Bowl.

454.    Moneyline issued a 2018 K-1 to Wright (the "Wright 2018 Moneyline K-1") showing a starting balance of approximately $150,000.00 with earnings of approximately $24,388.00 and an ending capital account of approximately $174,388.00.

455.    Moneyline issued a statement to Wright for Spring 2019 showing a beginning investment value for Wright of approximately $150,000.00 and earnings of approximately $3,814.00 for a total investment value of approximately $153,814.00.

456.    Moneyline next issued a statement to Wright for approximately Autumn 2019 showing a beginning investment value on January 1, 2019, of approximately $174,388.00 had earned approximately $21,965.00 during the timeframe, resulting in approximately $196,353.00 investment value as of September 15, 2019.  In the "Notes" section of this statement is sentence that "next report will be end-of-year."

457.    Moneyline issued a K-1 to Wright for 2019 from CliftonLarsonAllen LLP (the "Wright 2019 Moneyline K-1") also reflecting increases of approximately $32,261.00 resulting in a total investment value of approximately $206,649.00.

458.    Moneyline also issued a statement to Wright showing for year 2020 a beginning investment value of approximately $174,388.00, five-figure earnings and a projected investment value as of December 31, 2019, of approximately $206,649.00.

459.    Moneyline then issued a statement to Wright showing increasing investment with a projected investment value of approximately $195,314.00 as of December 31, 2020.   This statement included an invitation for Wright and spouse to visit Las Vegas and Moneyline's operations.

460.    Wright did not visit Las Vegas or otherwise take up this invitation.

461.    On or about January 7, 2020, Wright sent an email to Matt (to request a distribution of accumulated profits to pay his taxes incurred related to the gains stated for the Moneyline investments and received a response that "My team and I just liquidated the necessary apps to send your profits – mailed tomorrow."

462.    Wright relied on documentation received from Matt and/or Moneyline, and/or upon information and belief Sonya, to prepare and pay taxes.

463.    Matt used his relationship to and affiliation with the Known Affiliates in furtherance of his scheme to defraud Wright.

464. Matt used his relationship to and affiliation with Sonya in furtherance of his scheme to defraud Wright.

465. Sonya used her relationship to and affiliation with the Known Affiliates in furtherance of her scheme to defraud Wright.

466. Sonya used her relationship to and affiliation with Matt in furtherance of her scheme to defraud Wright.

467. Upon information and belief, all of Wright invested funds have been embezzled, spent, and/or otherwise disposed of by the Debtors, and Wright lost funds as a result of the Debtors' fraudulent scheme.

468. Upon information and belief, all or nearly all of the funds invested by Wright were gone, and did not exist in the amounts stated at the time such statements, financial statements, reports, and K-1s were received by Wright from Matt and/or Sonya and/or Moneyline.

469. Upon information and belief, all of the statements, financial statements, reports, and K-1s received by Wright were generated by Matt and/or Sonya and/or Moneyline and portrayed false information concerning Wright investments funds.

470. As a result of, *inter alia*, the foregoing, plus any taxes and/or liabilities and/or penalties thereupon, the Debtors incurred a debt owed to Wright (the "Wright Debt").

**CAUSE OF ACTION 1: NONDISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(a)(2)(A) (BOTH DEFENDANTS)**

471. Plaintiffs repeat, reallege, and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

472. 11 U.S.C. § 523(a)(2)(B) provides:

> A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt— . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

- 54 -

473.    The Debtors incurred the LaDuca Debt by obtaining money, property, services, and/or an extension, renewal, or refinancing through false pretenses, through false representations made to LaDuca, and/or through actual fraud committed against LaDuca by the Debtors.

474.    The Debtors incurred the Cespedes Debt by obtaining money, property, services, and/or an extension, renewal, or refinancing through false pretenses, through false representations made to Cespedes, and/or through actual fraud committed against Cespedes by the Debtors.

475.    The Debtors incurred the Eickholt Debt by obtaining money, property, services, and/or an extension, renewal, or refinancing through false pretenses, through false representations made to Eickholt, and/or through actual fraud committed against Eickholt by the Debtors.

476.    The Debtors incurred the Freeman Debt by obtaining money, property, services, and/or an extension, renewal, or refinancing through false pretenses, through false representations made to Freeman, and/or through actual fraud committed against Freeman by the Debtors.

477.    The Debtors incurred the North Debt by obtaining money, property, services, and/or an extension, renewal, or refinancing through false pretenses, through false representations made to North, and/or through actual fraud committed against North by the Debtors.

478.    The Debtors incurred the Phillips Debt by obtaining money, property, services, and/or an extension, renewal, or refinancing through false pretenses, through false representations made to Phillips, and/or through actual fraud committed against Phillips by the Debtors.

479.    The Debtors incurred the Pinnell Debt by obtaining money, property, services, and/or an extension, renewal, or refinancing through false pretenses, through false representations made to Pinnell, and/or through actual fraud committed against Pinnell by the Debtors.

480.    The Debtors incurred the Ribeiro Debt by obtaining money, property, services, and/or an extension, renewal, or refinancing through false pretenses, through false representations made to Ribeiro, and/or through actual fraud committed against Ribeiro by the Debtors.

481.    The Debtors incurred the Schuerger Debt by obtaining money, property, services, and/or an extension, renewal, or refinancing through false pretenses, through false representations made to Schuerger, and/or through actual fraud committed against Schuerger by the Debtors.

482. The Debtors incurred the Weihe Debt by obtaining money, property, services, and/or an extension, renewal, or refinancing through false pretenses, through false representations made to Weihe, and/or through actual fraud committed against Weihe by the Debtors.

483. The Debtors incurred the Wright Debt by obtaining money, property, services, and/or an extension, renewal, or refinancing through false pretenses, through false representations made to Wright, and/or through actual fraud committed against Wright by the Debtors.

484. The Plaintiffs were damaged by the Debtors in an amount to be determined at trial in this matter.

485. The Plaintiffs are also entitled to recover their attorney fees and costs of suit.

### CAUSE OF ACTION 2: NONDISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(a)(2)(B) (BOTH DEFENDANTS)

486. Plaintiffs repeat, reallege, and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

487. 11 U.S.C. § 523(a)(2)(B) provides:

> A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt— . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— . . . (B) use of a statement in writing—
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive[.]

488. The Debtors incurred the LaDuca Debt by obtaining money, property, services, or an extension, renewal, or refinancing through use of statement(s) in writing to LaDuca, which statement(s) were materially false, respected the Debtors and/or one or more of the Known Affiliates' financial condition(s), were caused by the Debtors to be made or published with an intent to deceive; and, LaDuca reasonably relied on such statements and was damaged thereby.

489. The Debtors incurred the Cespedes Debt by obtaining money, property, services, or an extension, renewal, or refinancing through use of statement(s) in writing to Cespedes, which statement(s) were materially false, respected the Debtors and/or one or more of the Known

- 56 -

Affiliates' financial condition(s), were caused by the Debtors to be made or published with an intent to deceive; and, Cespedes reasonably relied on such statements and was damaged thereby.

490.    The Debtors incurred the Eickholt Debt by obtaining money, property, services, or an extension, renewal, or refinancing through use of statement(s) in writing to Eickholt, which statement(s) were materially false, respected the Debtors and/or one or more of the Known Affiliates' financial condition(s), were caused by the Debtors to be made or published with an intent to deceive; and, Eickholt reasonably relied on such statements and was damaged thereby.

491.    The Debtors incurred the Freeman Debt by obtaining money, property, services, or an extension, renewal, or refinancing through use of statement(s) in writing to Freeman, which statement(s) were materially false, respected the Debtors and/or one or more of the Known Affiliates' financial condition(s), were caused by the Debtors to be made or published with an intent to deceive; and, Freeman reasonably relied on such statements and were damaged thereby.

492.    The Debtors incurred the North Debt by obtaining money, property, services, or an extension, renewal, or refinancing through use of statement(s) in writing to North, which statement(s) were materially false, respected the Debtors and/or one or more of the Known Affiliates' financial condition(s), were caused by the Debtors to be made or published with an intent to deceive; and, North reasonably relied on such statements and was damaged thereby.

493.    The Debtors incurred the Phillips Debt by obtaining money, property, services, or an extension, renewal, or refinancing through use of statement(s) in writing to Phillips, which statement(s) were materially false, respected the Debtors and/or one or more of the Known Affiliates' financial condition(s), were caused by the Debtors to be made or published with an intent to deceive; and, Phillips reasonably relied on such statements and was damaged thereby.

494.    The Debtors incurred the Pinnell Debt by obtaining money, property, services, or an extension, renewal, or refinancing through use of statement(s) in writing to Pinnell, which statement(s) were materially false, respected the Debtors and/or one or more of the Known Affiliates' financial condition(s), were caused by the Debtors to be made or published with an intent to deceive; and, Pinnell reasonably relied on such statements and was damaged thereby.

495.    The Debtors incurred the Ribeiro Debt by obtaining money, property, services, or an extension, renewal, or refinancing through use of statement(s) in writing to Ribeiro, which statement(s) were materially false, respected the Debtors and/or one or more of the Known Affiliates' financial condition(s), were caused by the Debtors to be made or published with an intent to deceive; and, Ribeiro reasonably relied on such statements and was damaged thereby.

496.    The Debtors incurred the Schuerger Debt by obtaining money, property, services, or an extension, renewal, or refinancing through use of statement(s) in writing to Schuerger, which statement(s) were materially false, respected the Debtors and/or one or more of the Known Affiliates' financial condition(s), were caused by the Debtors to be made or published with an intent to deceive; and, Schuerger reasonably relied on such statements and was damaged thereby.

497.    The Debtors incurred the Weihe Debt by obtaining money, property, services, or an extension, renewal, or refinancing through use of statement(s) in writing to Weihe, which statement(s) were materially false, respected the Debtors and/or one or more of the Known Affiliates' financial condition(s), were caused by the Debtors to be made or published with an intent to deceive; and, Weihe reasonably relied on such statements and was damaged thereby.

498.    The Debtors incurred the Wright Debt by obtaining money, property, services, or an extension, renewal, or refinancing through use of statement(s) in writing to Wright, which statement(s) were materially false, respected the Debtors and/or one or more of the Known Affiliates' financial condition(s), were caused by the Debtors to be made or published with an intent to deceive; and, Wright reasonably relied on such statements and was damaged thereby.

499.    The Plaintiffs were damaged by the Debtors in an amount to be determined at trial in this matter.

500.    The Plaintiffs are also entitled to recover their attorney fees and costs of suit.

**CAUSE OF ACTION 3: NONDISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(a)(4) (BOTH DEFENDANTS)**

501.    Plaintiffs repeat, reallege, and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

502.    11 U.S.C. § 523(a)(4) provides:

- 58 -

> A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt— . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]

503.    The Debtors committed fraud and/or defalcation while acting in a fiduciary capacity for LaDuca, and the LaDuca Debt was incurred by the Debtors as a result of this fraud and/or defalcation.

504.    The Debtors committed fraud and/or defalcation while acting in a fiduciary capacity for Cespedes, and the Cespedes Debt was incurred by the Debtors as a result of this fraud and/or defalcation.

505.    The Debtors committed fraud and/or defalcation while acting in a fiduciary capacity for Eickholt, and the Eickholt Debt was incurred by the Debtors as a result of this fraud and/or defalcation.

506.    The Debtors committed fraud and/or defalcation while acting in a fiduciary capacity for Freeman, and the Freeman Debt was incurred by the Debtors as a result of this fraud and/or defalcation.

507.    The Debtors committed fraud and/or defalcation while acting in a fiduciary capacity for North, and the North Debt was incurred by the Debtors as a result of this fraud and/or defalcation.

508.    The Debtors committed fraud and/or defalcation while acting in a fiduciary capacity for Phillips, and the Phillips Debt was incurred by the Debtors as a result of this fraud and/or defalcation.

509.    The Debtors committed fraud and/or defalcation while acting in a fiduciary capacity for Pinnell, and the Pinnell Debt was incurred by the Debtors as a result of this fraud and/or defalcation.

510.    The Debtors committed fraud and/or defalcation while acting in a fiduciary capacity for Ribeiro, and the Ribeiro Debt was incurred by the Debtors as a result of this fraud and/or defalcation.

511.    The Debtors committed fraud and/or defalcation while acting in a fiduciary capacity for Schuerger, and the Schuerger Debt was incurred by the Debtors as a result of this fraud and/or defalcation.

512.    The Debtors committed fraud and/or defalcation while acting in a fiduciary capacity for Weihe, and the Weihe Debt was incurred by the Debtors as a result of this fraud and/or defalcation.

513.    The Debtors committed fraud and/or defalcation while acting in a fiduciary capacity for Wright, and the Wright Debt was incurred by the Debtors as a result of this fraud and/or defalcation.

514.    The Plaintiffs were damaged by the Debtors in an amount to be determined at trial in this matter.

515.    The Plaintiffs are also entitled to recover their attorney fees and costs of suit.

#### CAUSE OF ACTION 4: CIVIL CONSPIRACY (BOTH DEFENDANTS)

516.    Plaintiffs repeat, reallege, and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

517.    Matt and Sonya each individually engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming LaDuca including, *inter alia*, defrauding LaDuca, which damaged LaDuca.

518.    Matt and Sonya, acting by, through, and/or with the Known Affiliates engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming LaDuca including, *inter alia*, defrauding LaDuca, which damaged LaDuca.

519.    Matt and Sonya each individually engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Cespedes including, *inter alia*, defrauding Cespedes, which damaged Cespedes.

520.    Matt and Sonya, acting by, through, and/or with the Known Affiliates engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Cespedes including, *inter alia*, defrauding Cespedes, which damaged Cespedes.

- 60 -

521.     Matt and Sonya each individually engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Eickholt including, *inter alia*, defrauding Eickholt, which damaged Eickholt.

522.     Matt and Sonya, acting by, through, and/or with the Known Affiliates engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Eickholt including, *inter alia*, defrauding Eickholt, which damaged Eickholt.

523.     Matt and Sonya each individually engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Freeman including, *inter alia*, defrauding Freeman, which damaged Freeman.

524.     Matt and Sonya, acting by, through, and/or with the Known Affiliates engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Freeman including, *inter alia*, defrauding Freeman, which damaged Freeman.

525.     Matt and Sonya each individually engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming North including, *inter alia*, defrauding North, which damaged North.

526.     Matt and Sonya, acting by, through, and/or with the Known Affiliates engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming North including, *inter alia*, defrauding North, which damaged North.

527.     Matt and Sonya each individually engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Phillips including, *inter alia*, defrauding Phillips, which damaged Phillips.

528.     Matt and Sonya, acting by, through, and/or with the Known Affiliates engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Phillips including, *inter alia*, defrauding Phillips, which damaged Phillips.

529.     Matt and Sonya each individually engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Pinnell including, *inter alia*, defrauding Pinnell, which damaged Pinnell.

14749-01/2668176_7.docx

530.    Matt and Sonya, acting by, through, and/or with the Known Affiliates engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Pinnell including, *inter alia*, defrauding Pinnell, which damaged Pinnell.

531.    Matt and Sonya each individually engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Ribeiro including, *inter alia*, defrauding Ribeiro, which damaged Ribeiro.

532.    Matt and Sonya, acting by, through, and/or with the Known Affiliates engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Ribeiro including, *inter alia*, defrauding Ribeiro, which damaged Ribeiro.

533.    Matt and Sonya each individually engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Schuerger including, *inter alia*, defrauding Schuerger, which damaged Schuerger.

534.    Matt and Sonya, acting by, through, and/or with the Known Affiliates engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Schuerger including, *inter alia*, defrauding Schuerger, which damaged Schuerger.

535.    Matt and Sonya each individually engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Weihe including, *inter alia*, defrauding Weihe, which damaged Weihe.

536.    Matt and Sonya, acting by, through, and/or with the Known Affiliates engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Weihe including, *inter alia*, defrauding Weihe, which damaged Weihe.

537.    Matt and Sonya each individually engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Wright including, *inter alia*, defrauding Wright, which damaged Wright.

538.    Matt and Sonya, acting by, through, and/or with the Known Affiliates engaged in concerted action intended to accomplish unlawful objectives for the purpose of harming Wright including, *inter alia*, defrauding Wright, which damaged Wright.

539.    The Plaintiffs were damaged by the Debtors in an amount to be determined at trial in this matter.

540.    The Plaintiffs are also entitled to recover their attorney fees and costs of suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in favor of each of the Plaintiffs and against Matt and against Sonya as follows:

1.    That this Court find that Plaintiffs (LaDuca, Cespedes, Eickholt, Freeman, North, Phillips, Pinnell, Ribeiro, Schuerger, Weihe, and Wright) were damaged by the Debtors and award judgment in favor of each of the Plaintiffs (LaDuca, Cespedes, Eickholt, Freeman, North, Phillips, Pinnell, Ribeiro, Schuerger, Weihe, and Wright) against Matt and Sonya in amount of monetary damages to be determined at trial in this matter;

2.    That this Court determine all damages and indebtedness owed by the Debtors to LaDuca (the LaDuca Debt) is not dischargeable in the Bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6);

3.    That this Court determine all damages and indebtedness owed by the Debtors to Cespedes (the Cespedes Debt) is not dischargeable in the Bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6);

4.    That this Court determine all damages and indebtedness owed by the Debtors to Eickholt (the Eickholt Debt) is not dischargeable in the Bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6);

5.    That this Court determine all damages and indebtedness owed by the Debtors to Freeman (the Freeman Debt) is not dischargeable in the Bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6);

6.    That this Court determine all damages and indebtedness owed by the Debtors to North (the North Debt) is not dischargeable in the Bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6);

HOLLEY DRIGGS

14749-01/2668176_7.docx

7.     That this Court determine all damages and indebtedness owed by the Debtors to Phillips (the Philips Debt) is not dischargeable in the Bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6);

8.     That this Court determine all damages and indebtedness owed by the Debtors to Pinnell (the Pinell Debt) is not dischargeable in the Bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6);

9.     That this Court determine all damages and indebtedness owed by the Debtors to Ribeiro (the Ribeiro Debt) is not dischargeable in the Bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6);

10.     That this Court determine all damages and indebtedness owed by the Debtors to Schuerger (the Schuerger Debt) is not dischargeable in the Bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6);

11.     That this Court determine all damages and indebtedness owed by the Debtors to Weihe (the Weihe Debt) is not dischargeable in the Bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6);

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

HOLLEY DRIGGS

14749-01/2668176_7.docx

12.    That this Court determine all damages and indebtedness owed by the Debtors to Wright (the Wright Debt) is not dischargeable in the Bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6);

13.    For an award of attorney fees and costs of suit herein incurred by Plaintiffs, as determined by the Court;

14.    For such other and further relief as the Court deems just and proper.

Dated this 10th day of February 2022.

**HOLLEY DRIGGS**

_/s/ Mary Langsner_
F. Thomas Edwards, Esq. (NBN 9549)
Mary Langsner, Ph.D. (NBN 13707)
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101

*Attorneys Charles J. LaDuca; Buggy Holdings LLC; Juan Cespedes; John L. Eickholt; Jaisen Freeman; Freeman Master Holdings, LLC; Jennifer North aka Jennifer Floyd; John Andrew Phillips; Gay Su Pinnell; Sonia Dassow Ribeiro aka Sonia Dassow aka Sonia Ribeiro; Robert Schuerger; Thomas Weihe, by and through his representative Gwen Weihe; Jeffrey Wright*

- 65 -

14749-01/2668176_7.docx